IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MULTI-COLOR CORPORATION | ) | |
| | ) | Case No. 1:10-cv-280 |
| Plaintiff and Counterclaim Defendant, | ) | |
| | ) | Judge: Dlott |
| vs. | ) | |
| | ) | |
| GRAPHIC PACKAGING INTERNATIONAL, | ) | |
| INC. | ) | |
| | ) | |
| Defendant and Counterclaimant. | ) | |

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

## I.      INTRODUCTION

Plaintiff Multi-Color Corporation ("Multi-Color") alleges that Defendant Graphic

Packaging International, Inc. ("GPI") infringes claims 1, 4-6, 8, 10-11, 14-15, and 17-19 of U.S.

Patent No. 6,622,171 ("the '171 patent").  Herein, Multi-Color provides its position regarding the

proper claim construction for the eight patent claim terms that are in dispute.

The parties have approached claim construction very differently.  As instructed by the

Federal Circuit and decades of precedent governing claim construction, Multi-Color has

proposed definitions for the disputed claim terms that are derived directly from the claims

themselves, in view of the specification.  Also, the '171 patent and the asserted claims relate to

the construction of a multi-layered heat transfer label, and in particular the components of each of

the layers of the label.  Therefore, to further assist the Court with the claim construction process,

Multi-Color retained an independent expert, Dr. Alan Levine, who has more than thirty (30)

years of experience in chemistry and materials research.  Dr. Levine also has extensive

experience in employing various analytical techniques, including analytical chemistry, optical

1

and electron microscopy, and thermal and physical test procedures, to analyze materials and understand their chemical properties.

GPI's proposed definitions, on the other hand, are inconsistent and incompatible with the claims and the specification of the '171 patent. GPI also has not identified an expert with the experience, or independence, of Dr. Levine. Rather, GPI attempts to rely on its own employees to support its proposed definitions.

## II.    OVERVIEW OF THE '171 PATENT – HEAT TRANSFER LABEL

Heat transfer labels are commonly used for decorating and/or labeling of containers for beverages, essential oils, detergents, adverse chemicals, and health and beauty aids. Heat transfer labels are desirably resistant to abrasion and chemical effects in order to avoid a loss of label information and desirably possess good characteristics of adhesion to the articles to which they are affixed. (*See* Exhibit A, the '171 patent, at Col. 1, ll. 11-17). They are "multilayered laminates, with each layer having its own function." (Col. 1, ll. 19-20).

A long-felt disadvantage associated with the use of prior heat transfer labels in connection with polyethylene, polypropylene, PET, and/or acrylonitrile surfaces, is that the label will not adhere unless the surface has previously been treated by some oxidizing technique. Typical oxidizing techniques include flaming the polyethylene, polypropylene, PET, or acrylonitrile surface with an oxidizing flame. Because the pretreated polyethylene, polypropylene, PET, or acrylonitrile surface has a higher energy surface than the untreated polyethylene, polypropylene, PET, or acrylonitrile surface, it is more receptive to binding to the adhesive layer of the label. However, pretreatment of the article results in increased time, equipment, and cost in labeling the article. (Col. 2, ll. 4-35).

The '171 patent discloses and claims a novel heat transfer label that is particularly well suited for use on untreated polyethylene, polypropylene, PET, or acrylonitrile surfaces, such as untreated high, medium, or low density polyethylene surfaces and/or untreated high, medium, or low density polypropylene surfaces. (Col. 2, ll. 36-41)  The heat transfer label claimed in the '171 patent overcomes the drawbacks described above by providing a heat transfer label that includes (a) a support portion; and (b) a transfer portion over the support portion for transfer of the transfer portion from the support portion to an article upon application of heat to the support portion while the transfer portion is placed into contact with the article. (Col. 2, ll. 45-55)  The transfer portion includes an adhesive layer comprising a vinyl acetate resin, a tackifying petroleum hydrocarbon, and a microcrystalline wax. (Col. 2, ll. 45-55).

As a result, the adhesive of the label claimed in the '171 patent can bond to nonoxidized polyethylene, polypropylene, PET, and acrylonitrile containers.  The need for surface pretreatment of the article being labeled is thereby eliminated. (Col. 2, ll. 62-65).



**FIG. 1**

According to the Detailed Description of the Invention, and as noted in the Figure above, the support portion 12 of the heat transfer label disclosed and claimed in the '171 patent "may include a carrier sheet 18, which is typically paper or a similarly suitable substrate, and a release portion 16." (Col. 3, ll. 31-34).  "The release portion 16 may include (1) a nonwax release layer 20, and (2) a skim coat 22." (Col. 3, ll. 35-36).  "The…nonwax release layer 20 and skim coat 22

3

together form the release portion 16 of the support portion 12." (Col. 3, ll. 65-67).  Thus, "the

release portion 16 and the carrier sheet 18 together form the support portion 12." (Col. 3, ll. 67 –

Col. 4, ll. 1).

The '171 patent also discloses and claims a label with a "transfer portion (i.e., ink design

layer and adhesive layer)." (Col. 1, ll. 26-27).  The transfer portion may, but does not necessarily

include, a protective lacquer layer. (Col. 2, ll. 55-56; Col. 3, ll. 48-49:  "The transfer portion 14

may include a protective lacquer layer…").  Indeed, Claim 1 of the '171 patent calls for a transfer

portion including at least an ink layer and an adhesive layer, whereas Claim 8 calls for a transfer

portion that further comprises a protective lacquer layer. (Col. 9, ll. 51-55; Col. 10, ll. 20-21).

The '171 patent provides that a portion of the support portion also may transfer upon

application of the label to a container.  Specifically, "[d]uring label transfer, a small portion of

the skim coat 22 [which is part of the "release portion 16"] may be transferred along with the

transfer portion 14 of the label 10 onto the article being labeled." (Col. 3, ll. 42-45).  In another

embodiment, "[d]uring label transfer, a small portion of the wax release layer 30 may be

transferred along with the transfer portion 14 of the label 10 onto the article being labeled." (Col.

4, ll. 27-29).  "Any wax that transfers may thereafter be subjected to a postflaming technique."

(Col. 4, ll. 29-30).

Thus, when the support portion is subjected to heat, a small portion of the skim coat 22

[which is part of the "release portion 16"] may melt and be separated from the carrier sheet along

with the transfer portion 14.  The adhesive layer adheres the ink design layer to an article being

labeled.  Additionally or alternatively, the labels may include a separate protective layer

overlying the ink design layer to protect the ink design layer from abrasion. (Col. 1, ll. 19-35).

III.    **LEGAL STANDARDS FOR CONSTRUING CLAIMS**

A.    **The Claim Terms Are The Primary Resource**

It is fundamental patent law that, in construing claims, the court must look first to the language of the claims themselves. *See, e.g., Middleton, Inc. v. Minnesota Mining & Mfg. Co.,* 311 F.3d 1384, 1387 (Fed. Cir. 2002).  To that end, "the words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (*quoting Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  More specifically, "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Id.* at 1313; *see also Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1367 (Fed. Cir. 2003).  "The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." *Id.*

B.    **The Specification Provides Context For The Invention And Claim Terms**

The claims, however, do not stand alone, and "must be read in view of the specification of which they are a part." *Phillips*, 415 F.3d at 1315 (*quoting Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370, 116 S. Ct. 1384 (1996)). The Federal Circuit and "its predecessors have long emphasized the importance of the specification in claim construction." *Id.*  "[T]he specification is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582.  The Federal Circuit has reaffirmed that "the best source for understanding a technical term is the specification from which it arose." *Phillips*, 415

5

F.3d at 1315 (*quoting Multiform Desicants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998)).

> The importance of the specification in claim construction derives from its statutory role. The close kinship between the written description and the claims is enforced by the statutory requirement that the specification describe the claimed invention in 'full, clear, concise, and exact terms.' 35 U.S.C. § 112, para. 1 . . . In light of the statutory directive that the inventor provide a 'full' and 'exact' description of the claimed invention, the specification necessarily informs the proper construction of the claims.

*Id.* at 1316 (citations omitted).

"It is therefore entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Id.* at 1317. For example, if the patentee expressly defines a claim term in the specification, then that is the definition to be applied. *Rambus Inc. v. Infineon Technologies AG*, 318 F.3d 1081, 1088 (Fed. Cir. 2003) ("inventors may act as their own lexicographers and use the specification to supply implicitly or explicitly new meanings for claim terms.").

### C. It Is Improper To Import Limitations From The Specification And Drawings Into The Claim Terms

Although it is entirely proper for the court to rely on the specification as to the meaning of the claims, it is improper to import limitations from the specification into the claim terms. *SuperGuide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004). By way of example, it is improper to import limitations from the specification into the claim terms based on an argument that the specification only depicts one embodiment of the invention:

> Under our precedent, a patentee's choice of embodiments can shed light on the intended scope of the claim, but a patent claim term is not limited merely because the embodiments in the specification all contain a particular feature.

*C.R. Bard, Inc. v. United States Surgical Group*, 388 F.3d 858, 865 (Fed. Cir. 2004); *see also*

*SuperGuide*, 358 F.3d at 875 ("Though understanding the claim language may be aided by the

explanations contained in the written description, it is important not to import into a claim

limitations that are not a part of the claim.  For example, a particular embodiment appearing in

the written description may not be read into a claim when the claim language is broader than the

embodiment.").

### D.     The Prosecution History

In addition to the claim language and the specification, the court may also consider the

patent's prosecution history. *Phillips*, 415 F.3d at 1317.  The prosecution history, which is part of

the "intrinsic evidence," consists of the complete record of the proceedings before the PTO and

includes the prior art cited during the examination of the patent. *Id.*  Because the patentee creates

the prosecution history in attempting to explain and obtain the patent, "the prosecution history

can often inform the meaning of the claim language by demonstrating how the inventor

understood the invention and whether the inventor limited the invention in the course of

prosecution, making the claim scope narrower than it would otherwise be." *Id.*

### E.     Extrinsic Evidence Such As Expert Testimony May Be Utilized

Extrinsic evidence "consists of all evidence external to the patent and prosecution history,

including expert and inventor testimony, dictionaries, and learned treatises."  *Markman*, 52 F.3d

at 980.  Expert testimony, if available, should be considered:

> [E]xtrinsic evidence in the form of expert testimony can be useful to a court for a
> variety of purposes, such as to provide background on the technology at issue, to
> explain how an invention works, to ensure that the court's understanding of the
> technical aspects of the patent is consistent with that of a person of skill in the art,
> or to establish that a particular term in the patent or the prior art has a particular
> meaning in the pertinent field.

*Phillips*, 415 F.3d at 1318. Indeed, such expert testimony can be "indispensible":

> '[I]t is entirely appropriate, perhaps even preferable, for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field.' Moreover, we are reminded of the potential value of scientific testimony during claim construction hearings by the early statement of the Supreme Court that where the claims or specification 'contain technical terms or terms of art the court may hear the testimony of scientific witnesses to aid the court in coming to a correct conclusion.' The Court continued, stating that 'the testimony of scientific witnesses is indispensable to a correct understanding' of the meaning of disputed claim terms, and that 'it would undoubtedly be error in the court to reject the testimony.'

*AFG Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239, 1249 (Fed. Cir. 2001) (emphasis added) (citations omitted).

As such, the Federal Circuit "acknowledges the relevance of extrinsic evidence, often presented in the form of expert testimony." *Metabolife Labs, Inc. v. Lab. Corp.*, 370 F.3d 1354, 1361 (Fed. Cir. 2004) (*citing Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999)) ("Consultation of extrinsic evidence is particularly appropriate to ensure that [the court's] understanding of the technical aspects of the patent is not entirely at variance with the understanding of one skilled in the art."). In fact, failure to take into account the testimony of persons of ordinary skill may constitute reversible error. *AFG Indus.*, 239 F.3d at 1249.

## IV.    THE DISPUTED CLAIM TERMS OF THE '171 PATENT

At the outset of the claim construction process, the Parties jointly created a list of eight claim terms for the Court to construe. The eight disputed claim terms are provided in a summary chart in the Joint Claim Construction Chart attached hereto as Exhibit B. The remainder of this brief will provide support for Multi-Color's proposed claim definitions.

**1. heat transfer label:** a multi-layered laminate which through the application of heat is adhered to an object and provides decoration or information about it.

As described in the Background of the Invention section of the specification of the '171 patent, heat transfer labels are "multilayered laminates." (*See* Exhibit A, the '171 patent, Col. 1, ll. 19-20).  "When subjected to heat…the adhesive layer adheres the ink design layer to an article being labeled."  In this way, the labels are used in the "decorating and/or labeling of containers." (Col. 1, ll. 27-30).  Multi-Color submits that the above-noted excerpts from the specification set forth the proper definition of the claim term "heat transfer label," and that Multi-Color's proposed definition is thoroughly and accurately derived therefrom.

It must be noted that the claim term recites a "label."  The claim must therefore be limited accordingly.  *Phillips*, 415 F.3d at 1312.  According to THE NEW OXFORD AMERICAN DICTIONARY (2d ed. 2005), a label is "attached to an object and giving information about it." (*See* Exhibit C, at p. 943).  It follows that not all laminates are "labels."  For example, a sandwich is a "multi-layered structure," but it would be absurd to suggest that such a "multi-layered structure" is a "label."  Rather, laminates are only labels if they are used for "decorating" or if they are "giving information about" the article to which they are adhered, as recited in the specification. (*See* Exhibit A, the '171 patent, Col. 1, ll. 11-16).  For these reasons, Multi-Color submits that the proper definition of the claim term "heat transfer label" is "a multi-layered laminate which through the application of heat is adhered to an object and provides decoration or information about it."

**2. support portion:** carrier sheet and release portion.

According to the Detailed Description of the Invention, the "support portion" of the heat transfer label disclosed and claimed in the '171 patent "may include a carrier sheet 18, which is

typically paper or a similarly suitable substrate, and a release <u>portion</u> 16." (Col. 3, ll. 31-34) (emphasis added). "The release <u>portion</u> 16 may include (1) a nonwax release layer 20, and (2) a skim coat 22." (Col. 3, ll. 35-36). "The…nonwax release layer 20 and skim coat 22 together form the release <u>portion</u> 16 of the support portion 12." (Col. 3, ll. 65-67). Thus, "the release <u>portion</u> 16 and the carrier sheet 18 together form the support portion 12." (Col. 3, ll. 67 – Col. 4, ll. 1).

It should be noted that the '171 patent describes embodiments wherein the support portion includes a release <u>portion,</u> and not a release <u>layer,</u> because (1) the release portion may itself include a release layer and (2) only a portion of the release may transfer. Specifically, "The release <u>portion</u> 16 may include (1) a nonwax release layer 20, and (2) a skim coat 22." (Col. 3, ll. 35-36). Also, "[d]uring label transfer, a small portion of the skim coat 22 may be transferred along with the transfer portion 14 of the label 10 onto the article being labeled." (Col. 3 ll. 42-45). In another embodiment, "[d]uring label transfer, a small portion of the wax release layer 30 may be transferred along with the transfer portion 14 of the label 10 onto the article being labeled." (Col. 4, ll. 27-29).

Because embodiments disclosed in the '171 patent expressly contemplate that (1) the release portion may itself include a release layer and (2) only part of the release portion may transfer, it is less accurate to construe the support portion as including a release layer. That is why Multi-Color proposes that the proper construction of the claim term "support portion" is "carrier sheet and release portion."

**3. transfer portion:** a portion that includes an ink layer and an adhesive layer.

It is fundamental patent law that, in construing claims, the court must look first to the language of the claims themselves. *See, e.g., Middleton, Inc. v. Minnesota Mining & Mfg. Co.,*

311 F.3d 1384, 1387 (Fed. Cir. 2002). To that end, "the words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (*quoting Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

With respect to the claim term "transfer portion," Claims 1 and 8 of the '171 patent provide:

> Claim 1. A heat transfer label comprising: (a) a support portion; (b) a transfer portion…said transfer portion including at least an ink layer; and an adhesive layer…

> Claim 8. The heat transfer label of claim 1, wherein said transfer portion further comprises a protective lacquer layer.

(Col. 9, ll. 44-54; Col. 10, ll. 20-21).

Because Claim 1 provides that the transfer portion need only include "an ink layer; and an adhesive layer," Multi-Color submits that the proper construction of this claim term is "a portion that includes an ink layer and an adhesive layer." Because Claim 8 provides that the transfer portion may further comprise a protective lacquer layer, it is expressly clear that that term, as used in Claim 1, does not require a protective lacquer layer.

It would also be inconsistent with Claim 8 to define "transfer portion" as requiring a protective lacquer layer. Such a definition would render Claim 8, and its further requirement of a protective lacquer layer, superfluous. Otherwise stated, if "transfer portion" is defined as requiring a protective lacquer layer, then Claim 8 would effectively read as follows: "The heat transfer label of claim 1, wherein said [portion that includes the protective lacquer layer, ink layer, and adhesive layer] further comprises a protective lacquer layer." Such a definition is, on its face, improper. *See Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 885 (Fed. Cir. 2008)

11

(refusing to adopt a claim construction which would render a claim limitation meaningless);

*Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1305-07 (Fed. Cir. 2000).

One additional comment is worth making relative to the claim term "transfer portion." As noted above in connection with the claim term "support portion," the '171 patent provides that some of the release portion may transfer. Specifically, "[d]uring label transfer, a small portion of the skim coat 22 may be transferred along with the transfer portion 14 of the label 10 onto the article being labeled." (Col. 3 ll. 42-45). Because the '171 patent expressly contemplates some of the release portion transferring, it is inappropriate to construe the transfer portion as excluding all of the release portion.

**4-5. an article that has not undergone an oxidizing treatment:** a container with a polyethylene, polypropylene, PET, or acrylonitrile surface that typically would be, but has not been, subjected to an oxidizing treatment to promote adhesion.

The Federal Circuit has repeatedly made it clear that all claim terms, including "an article that has not undergone an oxidizing treatment," do in fact limit the scope of the inventions claimed in the '171 patent. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) ("While not an absolute rule, all claim terms are presumed to have meaning in a claim."); *see also Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *see also Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) (Claims must be "interpreted with an eye toward giving effect to all terms in the claim."). That is why a claim construction analysis begins and remains centered on the claim language itself, for it is the language the patentee has chosen to "particularly point[ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention." *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001).

That the claim term "an article that has not undergone an oxidizing treatment" limits the scope of the inventions claimed in the '171 patent (and should be construed) is confirmed throughout the specification. By way of example, the Summary of the Invention section of the specification provides that "[t]he adhesive of the <u>present invention can bond to nonoxidized polyethylene, polypropylene PET, and acrylonitrile surfaces…</u>" (*See* Exhibit A, the '171 patent, at Col. 2, ll. 62-64). In such circumstances, when the specification describes the "present invention," the Federal Circuit has stated unequivocally, and repeatedly, that the invention is limited and it is error not to construe the claim term as limiting:

> Vonage challenges the district court's construction of the term 'localized wireless gateway system' of asserted claims 1 and 6-8 of the '880 patent (the same term pertinent to the 'few feet' limitation) on the ground that the district court erred in failing to require that the patented gateway system 'compress[]/decompress[] and packetiz[e] voice signals.' We agree. The 'Disclosure of the Invention' section of the '880 patent begins with a description of the gateway system of the 'present invention.' In the course of describing the 'present invention,' the specification then states that '[t]he gateway compresses and decompresses voice frequency communication signals and sends and receives the compressed signals in packet form via the network.' When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention. *Honeywell Int'l, Inc. v. ITT Indus.*, 452 F.3d 1312, 1318-19 (Fed. Cir. 2006); *Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001) ('[T]he characterization of the coaxial configuration as part of the 'present invention' is strong evidence that the claims should not be read to encompass the opposite structure.'); *see also Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1368 (Fed. Cir. 2007) (specification's description of a 'critical element' found limiting). Thus the term 'localized wireless gateway system' must be limited to one performing compression and packetization functions at the gateway.

*Verizon Services Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007).

That this claim term should be construed and limits the claimed invention is bolstered even further by the particular problem being worked on by the inventor, and its solution. The particular problem being worked on is heat transfer labels for "containers." (*See* Exhibit A, the

'171 patent, at Col. 1, ll. 5-7). In particular, the problem is recited in the specification as follows: "One disadvantage associated with the use of [prior labels], and similar heat transfer labels, on polyethylene, polypropylene, PET, and/or acrylonitile, is that the label will not adhere to a polyethylene, polypropylene, PET, and/or acrylonitile surface unless the surface has been treated by some oxidizing treatment." (Col. 2, ll. 5-10).

The solution posed by the inventor of the '171 patent makes it undeniably clear that this claim term limits the claimed inventions and should be construed:

> Thus, it would be desirable to provide a heat transfer label that is particularly well suited for use on untreated polyethylene, polypropylene, PET, and/or acrylonitile surfaces…The adhesive of the label of the present invention can bond to nonoxidized polyethylene, polypropylene, PET, and/or acrylonitile surfaces, and thus allows for the elimination of surface pretreatment of the article being labeled.

(Col. 2, ll. 36-38, 62-65).

These references to the specification, which describe the problem being worked on and the very nature of the solution to that problem, confirm that the claim term "an article that has not undergone an oxidizing treatment" should be construed. *Corning Glass Works v. Sumitomo Electric U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989); *see also American Imaging Servs., Inc. v. Intergraph Corp.*, Case No. 99-1485, 2000 U.S. App. LEXIS 13949, at * 14-15 (Fed. Cir. June 12, 2000). In addition, while this claim term does not employ functional language, even if it did the term would still have to be construed as limiting the scope of the invention. *K-2 Corp. v. Salomon S.S.*, 191 F.3d 1356, 1363 (Fed. Cir. 1999) ("The functional language is, of course, an additional limitation in the claim."); *see also Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1443-44 (Fed. Cir. 1997) (functional language analyzed as a claim limitation).

Turning to the claim term itself, *i.e.*, "an article that has not undergone an oxidizing treatment," the excerpts from the specification above indicate clearly that the "article" is "a container with a polyethylene, polypropylene, PET, or acrylonitrile surface." (*See*, *e.g.*, Exhibit A, the '171 patent, at Col. 2, ll. 36-38, 62-65: "Thus, it would be desirable to provide a heat transfer label that is particularly well suited for use on untreated polyethylene, polypropylene, PET, and/or acrylonitile surfaces.").  That is the very nature of the problem being worked on, and ultimately solved, by the inventor of the '171 patent.  Therefore, Multi-Color proposes that this term should be construed as "a container with a polyethylene, polypropylene, PET, or acrylonitrile surface that typically would be, but has not been, subjected to an oxidizing treatment to promote adhesion."

      **6.  microcrystalline wax:** a wax containing saturated linear and branched hydrocarbon chains and cyclic ring molecules, having a melting point between about 145ºF and 225ºF and needle crystalline structure when solidified.

Multi-Color's proposed construction for the claim term "microcrystalline wax" is derived directly from the specification of the '171 patent.  Specifically, each component of Multi-Color's proposed definition is a direct excerpt from the specification beginning at Column 6, line 31, wherein the specification describes what a microcrystalline wax is.

Microcrystalline waxes contain "<u>saturated hydrocarbons</u>," although "they are not as <u>linear a saturated hydrocarbon</u> as paraffin wax." (Col. 6, ll. 33-34, 39-41).  The specification also provides that "[m]icrocrystalline waxes (microwaxes) are characterized by an increased amount of <u>branching</u>." (Col. 6, ll. 37-39).  The specification further provides that microcrystalline waxes contain "<u>cyclic ring molecules</u>."  (Col. 6, ll. 41-42).  Multi-Color's proposed definition tracks each of these excerpts: "a wax containing <u>saturated linear and branched hydrocarbon chains</u> and <u>cyclic ring molecules</u>..."

15

The specification also describes the melting point of microcrystalline waxes, which range from between about 145ºF and 225ºF. (Col. 6, ll. 58-63). Finally, the specification provides that "[t]he crystalline structure of the microcrystalline wax contains predominantly… needle-like crystals." (Col. 6, ll. 43-44). Therefore, Multi-Color's proposal adds the limitation "having a melting point between about 145ºF and 225ºF and needle crystalline structure when solidified."

It bears mentioning that the number of carbon chains is not the defining determinant whether a wax is microcrystalline or not. (*See* Exhibit D, Declaration of Dr. Alan Levine, at ¶5). That is because, for example, there is an overlap in the number of carbon chains between paraffin waxes and microcrystalline waxes. *Id.* at ¶5. Thus, a particular number of carbon chains does not provide a reliable definition as to whether a wax is a paraffin wax or a microcrystalline wax. *Id.* at ¶5. Exemplifying this fact is that a wax with a carbon number of $C_{30}$ could be a microcrystalline wax, if the wax is characterized by the description disclosed in the specification of the '171 patent. *Id.* at ¶6. Also, if the number of carbon chains is utilized to define a microcrystalline wax, a wax that is microcrystalline to one of ordinary skill in the art may be improperly identified as another type of wax, for example a paraffin wax. *Id.* at ¶6.

Confirming this is the disclosure in the specification that microcrystalline waxes "characteristically contain" a particular range of carbon chains. *Id.* at ¶7. Based on the description in the specification that a microcrystalline wax merely "characteristically contains" a particular range of carbon chains, one of ordinary skill in the art would not rely upon the number of carbon chains as a factor defining the scope of a microcrystalline wax. *Id.* at ¶7. Rather, a particular number of carbon chains, such as $C_{30}$, $C_{35}$, or $C_{40}$, indicates that microcrystalline wax is likely present, a fact that would be confirmed through the other descriptions in the specification of the '171 patent. *Id.* at ¶8.

16

      **7. release agent:** No construction required.  Alternatively, "release agent included in the transfer portion."

      It is Multi-Color's position that the claim term "release agent" may be understood using its plain meaning, and therefore need not be construed.  In the alternative, Claims 8 and 10 of the '171 patent provide insight into the meaning of this claim term:

> Claim 8.  The heat transfer label of claim 1, wherein said transfer portion further comprises a protective lacquer layer.
>
> Claim 10.  The heat transfer label of claim 8, wherein said transfer portion further comprises a release agent and at least one of a hard polyester resin and an acrylic resin.

(*See* Exhibit A, the '171 patent, at Col. 10 ll. 28-30).

      Clear from Claims 8 and 10 is the fact that the "release agent" is an agent that is included in the transfer portion.  Equally clear is that the "release agent" need not necessarily be located in the protective lacquer layer, which may be another component of the transfer portion.  That is, Claim 10 incorporates the limitations of Claim 8, which includes a transfer portion that comprises, among other things, a protective lacquer layer.  In view of this, does Claim 10 call for the release agent to be included within the protective lacquer layer of the transfer portion?  No.  To the contrary, Claim 10 only requires the release agent to be included in the transfer portion.  Any other interpretation would needlessly import the limitation of a release agent being located in a particular portion of the transfer portion.  There is no claim language that would justify such a construction.

      In fact, it is wholly incorrect to require the "release agent" to be located in the protective lacquer layer.  That is because the specification and claims of the '171 patent describe an embodiment wherein the lacquer layer is not present at all.  Specifically, Claim 8 depends from Claim 1 and requires the transfer portion to further comprise a protective lacquer layer.  Thus,

Claim 1 need not have a lacquer layer at all.  (*See also* Col. 2, ll. 55-57: "The transfer portion

<u>may</u> further include (i) a protective lacquer layer"; *see also* Col. 3, ll. 48-49: "The transfer

portion 14 <u>may</u> include a protective lacquer layer") (emphasis added).

     **8.  hard polyester resin:** polyester polymer that is resistant to surface indentation.

     Claims 9 and 10 of the '171 patent bear on the claim term "hard polyester resin."  Those

claims are:

> Claim 9.  The heat transfer label of claim 8, wherein said protective lacquer layer
> further comprises a hard polyester or acrylic resin being a copolyester resin having
> a high tensile strength of 8000 psi, a low elongation of 7%, a 79 D scale Shore
> Durometer hardness, and a 156ºC ring and ball melt flow point.
>
> Claim 10. The heat transfer label of claim 8, wherein said transfer portion further
> comprises a release agent and at least one of a hard polyester resin and an acrylic
> resin.

(*See* Exhibit A, the '171 patent, at Col. 10, ll. 22-30).

     From Claims 9 and 10 it is obvious that a particular example of a hard polyester resin is

claimed in Claim 9.  It is equally clear from Claim 10 that a hard polyester resin need not be, and

in fact cannot be, limited to the particular example recited in Claim 9.

     This conclusion is also mandated by the specification, which discloses additional

examples of a hard polyester resin different than that claimed in Claim 9: "The protective lacquer

layer 24 may include a release agent and at least one of a hard polyester resin or an acrylic resin.

<u>An example of a hard polyester resin</u> is ViTEL® 2300 (Shell Chemical Company, Akron, Ohio),

a copolyester resin having a high tensile strength of 8000 psi, a low elongation of 7%, a 79 D

scale Shore Durometer hardness, and a 156°C ring and ball melt flow point." (Col. 5 ll. 7-20).  The

specification provides another example of a hard polyester resin that is not the particular example

claimed in Claim 9: "BOSTIK 7922 polyester resin…having a hardness of 65 Shore A…" (Col.

5, ll. 30-33).

From this background, the proper construction for this term can be determined.  A "resin" in this context has been defined in terms of a "polymer." (*See* Exhibit E, THE NEW OXFORD AMERICAN DICTIONARY (2d ed. 2005), at p. 1441: "…polymer used as the basis of plastics, adhesives, varnishes, or other products.").  Next, a premier treatise of composites, The Engineered Materials Handbook, Vol. 1 (Composites), defines hardness as "the resistance to surface indentation."  (*See* Exhibit F).  For these reasons, Multi-Color proposes that the term "hard polyester resin" should be defined as "polyester polymer that is resistant to surface indentation."

## V.  ADDITIONAL CLAIM CONSTRUCTION COMMENTS

Multi-Color proposes that the level of skill of a person of ordinary skill in the art is medium, and that ordinary artisan would hold a Masters degree, or the experiential equivalent thereof, in analytical chemistry.  (*See* Exhibit D, Declaration of Dr. Alan Levine, at ¶4).

Multi-Color also submits that there is no dispute that at least the following elements are found in the accused products, such that resolution by summary judgment is proper:  heat transfer label, support portion, transfer portion, an article that has not undergone an oxidizing treatment, and release agent.

Respectfully submitted,

MULTI-COLOR CORPORATION

Dated: November 1, 2011

s/ Brett A. Schatz
Brett A. Schatz (0072038)
bschatz@whepatent.com
Paul J. Linden (0083699)
plinden@whepatent.com
Trial Attorneys
WOOD, HERRON & EVANS, L.L.P.
441 Vine Street, 2700 Carew Tower
Cincinnati, Ohio 45202-2917
 (513) 241-2324
 (513) 241-6234 (Facsimile)

Attorneys for Multi-Color Corporation

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the November 1, 2011, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to the

following:  T. Earl LeVere, William M. Ragland, Jr., James F. Vaughan, Preston H. Heard, and

James M. Lennon.

s/ Brett A. Schatz
Brett A. Schatz (0072038)
bschatz@whepatent.com
Paul J. Linden (0083699)
plinden@whepatent.com
Trial Attorneys
WOOD, HERRON & EVANS, L.L.P.
441 Vine Street, 2700 Carew Tower
Cincinnati, Ohio 45202-2917
(513) 241-2324
(513) 241-6234 (Facsimile)
Attorneys for Multi-Color Corporation
