**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| MULTI-COLOR CORPORATION, | ) | |
| | ) | |
| Plaintiff and Counterclaim Defendant, | ) | |
| | ) | Case No. 1:10-cv-280 |
| v. | ) | |
| | ) | Judge:  Dlott |
| GRAPHIC PACKAGING INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant and Counterclaimant. | ) | |
| | ) | |
| | ) | |
| | ) | |

**GRAPHIC PACKAGING INTERNATIONAL, INC.'S**
**OPENING CLAIM CONSTRUCTION BRIEF**

OF COUNSEL:

William M. Ragland, Jr.
WOMBLE CARLYLE SANDRIDGE & RICE LLP
271 17th Street, NW
Suite 2400
Atlanta, GA 30363-1017
Telephone:  404-888-7466
Facsimile:   404-870-2401
Email:  wragland@wcsr.com

T. Earl LeVere (0063515)
SCHOTTENSTEIN ZOX & DUNN CO., LPA
250 West Street
Columbus, Ohio 43215
Telephone:  614-462-1095
Facsimile:   614-228-4847
E-mail:  elevere@szd.com

*Attorneys for Defendant and Counterclaimant*
*Graphic Packaging International, Inc.*

Defendant and Counterclaimant Graphic Packaging International, Inc. ("Graphic Packaging") files its Opening Claim Construction Brief pursuant to the Local Patent Rules for the U.S. District Court for the Southern District of Ohio ("Local Patent Rules") and this Court's Order issued May 6, 2011 (Doc. # 26). *See* S.D. Ohio Pat. R. 105.4(a).

## I.     BACKGROUND

This action was filed by Plaintiff and Counterclaim Defendant Multi-Color Corporation ("Multi-Color") against Graphic Packaging on May 3, 2010. Multi-Color's suit alleges infringement of claims 1, 4-6, 8, 10, 11, 14, 15, and 17-19 of U.S. Patent No. 7,622,171 ("the '171 Patent" attached as Ex. A hereto), entitled "Heat Transfer Label." (Doc. # 1.) Graphic Packaging's Counterclaim seeks a declaratory judgment of noninfringement and patent invalidity. (Doc. # 12.) On August 15, 2011, the parties filed a Joint Claim Construction and Prehearing Statement (Doc. # 29) setting forth disputed claim terms. On October 18, 2011, the parties agreed to exchange declarations to be filed in support of each party's claim construction positions prior to the deadline for filing the Opening Claim Construction Brief, in lieu of conducting claim construction depositions and of live testimony from witnesses at the *Markman* hearing.

## II.    SUMMARY OF THE TECHNOLOGY

### A.     Patent-in-suit

The '171 Patent relates to multi-layered structures called heat transfer labels. '171 Patent, Title of the Invention; FIGS. 1 & 2; *see also* Ansari Decl.[1], ¶¶ 7-10. Heat transfer labels generally have multiple layers that make up a transfer portion and a support portion. '171 Patent, col. 1, ll. 24-27. Typically, the transfer portion includes a protective layer, one or more ink layers, and an adhesive layer, and the support portion includes a carrier sheet and a release layer. '171 Patent,

---

[1] Declaration of Saifuddin M. Ansari, attached as Exhibit C.

col. 2, ll. 46-61; Ansari Decl., ¶ 8. The carrier sheet is a base material such as paper that supports the remaining layers of the heat transfer label. '171 Patent, col. 3, ll. 32-35.

To apply the heat transfer label to an object, the adhesive layer of the heat transfer label is brought into contact with a surface of the object. '171 Patent, col. 1, ll. 36-41. Heat is applied to the heat transfer label to soften the release layer so that the transfer portion can separate from the support portion. Pressure is also applied to the heat transfer label to facilitate transfer of the protective layer, ink layer, and adhesive layer to the object. '171 Patent, col. 1, ll. 36-41. The support portion is typically discarded following transfer of the protective, ink, and adhesive layers to the object. *See* Ansari Decl. ¶ 10. Thus, heat transfer labels differ from traditional labels such as pressure-sensitive adhesive labels (*i.e.*, peel-and-stick type labels) in that heat transfer labels do not include a liner such as paper that is adhered to the object. *Id.* at ¶ 12. Instead, the ink and adhesive are transferred to the object without the support portion that carries the ink, in a manner similar to other transfer printing technologies (for example, "iron-on" clothing products). *Id.* As a result, heat transfer labels are thinner and more flexible than traditional labels, and can be applied to a wider variety of objects than traditional labels including, for example, flat objects, round objects, and irregularly shaped objects. *Id.*

One method of adhering certain types of heat transfer labels to objects involves pre-treating the object through flaming it prior to application of the label, which oxidizes the surface of the object making it more receptive to adhesion of the label. '171 Patent, col. 2, ll. 16-18. Other methods do not involve flaming the object prior to application of the label. *See, e.g*., U.S. Patent No. 4,548,857 (issued Oct. 22, 1985), col.4, ll. 41-45. [2] The '171 Patent discloses one specific formulation for a heat transfer label that purports to be suitable for use with an object that

---

[2] A copy of U.S. Patent No. 4,548,857 is attached as Exhibit D.

has not been oxidized.  The heat transfer label of the '171 Patent, among other things, requires the use of microcrystalline wax in the adhesive layer.  '171 Patent, col. 2, ll. 46-55; col. 7, ll. 1-2.

### B.      Person of Ordinary Skill in the Art

"Before reviewing the bounds of the claim in light of the specification, the analysis requires attention to the level of skill assigned to a person of ordinary skill in the art."  *AllVoice Computing PLC v. Nuance Communications, Inc.*, 504 F.3d 1236, 1240 (Fed. Cir. 2007).  Here, a person of ordinary skill in the art is a person with (a) a Bachelor's Degree in Chemistry, Chemical Engineering, Materials Science, or other field of study that  includes a similar scope of coursework or (b) three or more years of technical experience working with adhesives, coatings, inks, printing, labels, or other similar technologies.

## III.      THE LAW OF CLAIM CONSTRUCTION

### A.      The Intrinsic Evidence Is The Most Significant Source For Determining Claim Meaning And The Patentee Can Act As His Own Lexicographer.

Claim construction is a matter of law, to be decided exclusively by the Court.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).  Claim terms are generally given their plain and ordinary meaning, which is the meaning the terms would have to one of ordinary skill in the art in question.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*).  To determine the proper construction, the Court must look first and foremost to the intrinsic evidence – *i.e.*, the claims, specification, and patent prosecution history – and should give such intrinsic evidence greater weight than extrinsic evidence, such as dictionaries, treatises, inventor testimony, or expert testimony.  *Id.* at 1317-19 (extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms"); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language.").  The claims

must be construed in a manner consistent with the specification. *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003). The patentee may act as his own lexicographer and may define a claim term either in the specification or in the prosecution history, even in a manner that is contrary to the term's plain and ordinary meaning. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002); *In re Glaug*, 283 F.3d 1335, 1340 (Fed. Cir. 2002).

**B.  Words In The Preamble Of A Patent Claim Are Not Part Of The Claimed Invention.**

Each patent claim consists of three basic elements: a preamble, a transitional word or phrase, and the body. The preamble introduces the general technical field of the claimed invention. *See, e.g.*, 3-8 Chisum on Patents § 8.06[1][b][i]. Claims generally are not limited by what is included in the claim preamble – *i.e.*, the preamble is not part of the claimed invention. *See Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002). The preamble should only be construed if it recites limitations of the claim, or if it is necessary to give "life, meaning, and vitality" to the claim. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999) (noting that the preamble is of no significance if it merely states the purposes or intended use of the invention). Further, the preamble is not part of the claimed invention and should be disregarded if it is simply the name of the claimed invention. *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1434-35 (Fed. Cir. 2000) (finding the preamble not limiting where it "merely gives a descriptive name" to the limitations in the body of the claim).

**C.  Claim Language That Recites Intended Use Of The Claimed Structure Does Not Add Substance To The Patent Claim.**

For apparatus claims, "generally patentability 'depends on the claimed structure, not on the use or purpose of that structure.'" *Marrin v. Griffin*, 599 F.3d 1290, 1294 (Fed. Cir. 2010) (*citing Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002)). Claim

language that includes the function or intended purpose of a claimed structure and "that merely states the result of the limitations in the claim adds nothing to the patentability or substance of the claim." *Texas Instruments Inc. v. Int'l Trade Comm'n*, 988 F.2d 1165, 1171-72 (Fed. Cir. 1993) (citing *Israel v. Cresswell*, 166 F.2d 153, 156 (CCPA 1948)). Under such circumstances, the claim language should be disregarded. *See Pac-Tec, Inc. v. Amerace Corp.*, 903 F.2d 796 (Fed. Cir. 1990) (functional language "does not always limit the claim").

## IV.     CLAIM CONSTRUCTION ARGUMENT[3]

### A.     Disputed Term: "heat transfer label"

| Multi-Color's Proposed Construction | Graphic Packaging's Proposed Construction |
|---|---|
| a multi-layered laminate which through the application of heat is adhered to an object and provides decoration or information about it | a multi-layered structure |

> 1.     The term "heat transfer label" does not require construction because it is not a claim limitation and should be disregarded.

The term "heat transfer label" is present in the preamble of all of the asserted claims of the '171 Patent. The preamble of the asserted claims provides no substance or structure to the claimed invention. The preamble of claim 1 merely recites "[a] heat transfer label." The actual structure of the heat transfer label – that is, the various layers or elements that comprise the heat transfer label – is set forth in the body of the claim. Thus, the term "heat transfer label" is merely a descriptive name given to the multi-layered structure defined in the body of the claims and should not be given any effect. *See Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed.

---

[3] In order to facilitate the Court's comparison of the parties claim construction contentions, Graphic Packaging will discuss the terms and phrases in the order in which they appear in the claims of the '171 Patent and in which they were submitted in the Joint Claim Construction and Prehearing Statement (Doc. # 29), though the ordering of these terms does not indicate the relative importance of the eight terms and phrases in dispute.

Cir. 2002); *IMS Tech., Inc. v. Haas Automation, Inc.,* 206 F.3d 1422, 1434-35 (Fed. Cir. 2000). Accordingly, it is unnecessary to construe the term "heat transfer label."

2.    Graphic Packaging's proposed construction is consistent with the intrinsic evidence, while Multi-Color's proposed construction is too restrictive, improper, and incomplete.

In the event the Court were to construe "heat transfer label," the appropriate construction is "a multi-layered structure," as proposed by Graphic Packaging. This proposed construction is consistent with the meaning of the term in view of the claims and specification of the '171 Patent, while Multi-Color's proposed construction is both too restrictive and incomplete.

Figures 1 and 2 – the only figures of the '171 Patent – depict multi-layered structures. The specification describes heat transfer labels as "multi-layered laminates, with each layer having its own function." '171 Patent, col. 1, ll. 19-20.[4] Additionally, during prosecution, Multi-Color defined the invention in terms of its structure – *i.e.*, with multiple layers. *See* Exh. B3, Response to Office Action, April 30, 2009, p. 9 ("Presently amended independent claim 1 is directed to a heat transfer label that (1) includes a support portion and a transfer portion, (2) wherein the transfer portion includes at least an ink layer and an adhesive layer having a vinyl acetate resin, a tackifying petroleum hydrocarbon resin, and a microcrystalline wax, and (3) where said ink layer is disposed between said adhesive layer and said support portion.").[5]

Multi-Color contends that a heat transfer label must "provide decoration or information about [the object]." That proposed definition is incorrect. The label could provide information about the contents of the object rather than the object itself, or the label could provide general

---

[4]  The term "laminate" has multiple meanings and if used in a definition of "heat transfer label" would itself require further construction. *See* Ansari Decl., ¶ 13. However, if the Court were to adopt the term "laminate" it should be defined as a "layered structure." *See* Exh. E, Collins English Dictionary – Complete and Unabridged, HarperCollins Publishers, 2003 (defining "lamination" (a synonym for the noun "laminate," *see* Exh. F, Dictionary.com Unabridged, 2011) as "a layered structure"); *see also* Exh. G, Wordsmyth English Dictionary, 2011 (defining "laminate" as "a product or material composed of or covered by one or more thin layers").
[5]  Excerpts from the prosecution history are attached as Exhibit B.

facts, commentary, slogans, advertisements, graphics, patterns, or other information unrelated to the object or, where applicable, its contents. *Id.* at ¶ 14. The extrinsic evidence also contradicts this aspect of Multi-Color's proposed construction. *See Merriam-Webster's Collegiate Dictionary* (Deluxe Edition 1998), p. 1023 (defining "label" as "written or printed matter accompanying an article to furnish identification or other information.") (attached as Exhibit H).

While Multi-Color's proposed construction is too restrictive in one regard, it is also improper and incomplete in another. Multi-Color attempts to include in its construction the process by which a heat transfer label is adhered to an object ("through the application of heat is adhered to an object"). However, as stated above, the heat transfer label should be defined only by its structure. Thus, it is improper to include the process language suggested by Multi-Color.

Further, even if it were proper to include in a definition the process by which the heat transfer label is applied, Multi-Color's proposed construction fails to mention that pressure is also necessary for proper transfer. Ansari Decl., ¶ 15. Indeed, the specification of the '171 Patent states: "More specifically, in the heat transfer labeling process, the label-carrying sheet is subjected to heat, and the label <u>is pressed</u> onto an article with the ink design layer making direct contact with the article." '171 Patent, col. 1, ll. 36-39 (emphasis added). Thus, even if the Court were to include process language in its construction, Multi-Color's proposed language fails to include the concept of pressure and therefore is inaccurate.

### B. Disputed Term: "support portion"

| Multi-Color's Proposed Construction | Graphic Packaging's Proposed Construction |
|---|---|
| carrier sheet and release portion | carrier sheet and release layer |

The '171 Patent supports a construction including "release layer." The term "support portion" appears in claims 1 and 17-19. The only difference between the parties' proposed

constructions of this term is that Graphic Packaging's refers to "release layer" and Multi-Color's refers to "release portion."  The plain language of the '171 Patent itself demonstrates that "release layer" is the correct term for use in defining "support portion."  First, the patentee defines the "support portion" to be a carrier sheet and a release layer.  In describing the general composition of a heat transfer label, the patentee states that "the label may be thought to include a 'support portion' (*e.g.*, carrier sheet and release layer)."  '171 Patent, col. 1, ll. 24-27 (emphasis added).  Further, the specification states that the "carrier sheet 18 and the wax release layer 30 form the "support portion" 12 of the label."  *Id.* at col. 4, ll. 48-49 (emphasis added).

By contrast, none of the '171 Patent claims recite a "release portion."  In fact, one of ordinary skill in the art typically would understand the term "release portion" to refer to the portion of layers that transfer and adhere to an object, which the '171 Patent calls the "transfer portion."  Ansari Decl., ¶ 19; *see* '171 Patent, col. 3, ll. 48-53.  The only reference to the term "release portion" in the '171 Patent concerns only one of the two exemplary embodiments in the specification, which mentions a carrier sheet and a release portion.  '171 Patent, col. 3, ll. 31-47.  Even this release portion, however, is further described as including a nonwax release layer and a skim coat.  *Id.*  Furthermore, the other embodiment describes the support portion as including a carrier sheet and a release layer, and contains no reference to a "release portion."  *Id.* at col. 4, ll. 1-30.  Thus, the specification – the background, summary, and detailed description – consistently describe the support portion in terms of a carrier sheet and release layer, not a release portion.  Multi-Color's attempt to incorporate "release portion" into the construction of "support portion" should be rejected.  Instead, the Court should adopt Graphic Packaging's proposed construction of "carrier sheet and release layer," which is applicable to all embodiments and is how one of ordinary skill in the art would understand the term "support portion." Ansari Decl., ¶ 18.

### C.   Disputed Term: "transfer portion"

| Multi-Color's Proposed Construction | Graphic Packaging's Proposed Construction |
|---|---|
| a portion that includes an ink layer and an adhesive layer | the portion that includes the protective lacquer layer, ink layer, and adhesive layer, but does not include the carrier sheet or release layer |

This term appears in claims 1, 8, and 10.  Graphic Packaging's proposed construction is consistent with the claims and the specification and includes the requisite level of specificity. Given the many layers and components of a heat transfer label, it is preferable to include specificity when defining the relevant terms.  *See* Ansari Decl., ¶ 7, 22.  Throughout the specification, the transfer portion is defined as comprising (1) a protective lacquer layer, (2) an ink design layer, and (3) an adhesive layer.  '171 Patent, col. 3, ll. 48-53; FIG. 2.  Those three layers are commonly included in a heat transfer label's transfer portion.  *See, e.g.*, Ansari Decl., ¶ 8. Further, both of the figures in the '171 Patent depict all three layers, including the protective lacquer layer.  '171 Patent, FIGS. 1 and 2.  Graphic Packaging's construction includes all three of those required elements, and expressly excludes the carrier sheet and release layer, which the patent specification describes as parts of the support portion.  '171 Patent, col. 4, ll. 48-49. Therefore, Graphic Packaging's construction is the most complete and accurate.  Multi-Color's proposed construction is incomplete because it does not include reference to the protective lacquer layer, and it does not exclude the carrier sheet and release layer.

### D.   Disputed Term: "for transfer of the transfer portion from the support portion to an article that has not undergone an oxidizing treatment upon application of heat to the support portion while the transfer portion is placed into contact with the article"

| Multi-Color's Proposed Construction | Graphic Packaging's Proposed Construction |
|---|---|
| Multi-Color proposes the following construction for "an article that has not undergone an oxidizing treatment"; no | No Construction Required – Not a Claim Limitation |

| construction is required for the remainder of Graphic Packaging's identified term:  A container with a polyethylene, polypropylene, PET, or acrylonitrile surface that typically would be, but has not been, subjected to an oxidizing treatment to promote adhesion. | |

1.     <u>This language only does nothing more than state the intended use of the claimed heat transfer label and thus is not part of the claimed invention and does not require any construction.</u>

This disputed phrase, which appears in independent claim 1 and therefore all of the asserted claims of the '171 Patent, is merely a statement of the function and intended use for the claimed heat transfer label.  Since all of the claims of the '171 Patent are apparatus claims, the patentability of the claims depends on the claimed structure, not on the intended use or purpose of that structure.  *See Marrin v. Griffin*, 599 F.3d 1290, 1294 (Fed. Cir. 2010).  Claim language adds nothing to the patentability of a claim if it merely describes the result of arranging the components as claimed.  *See Texas Instruments, Inc. v. Int'l Trade Comm'n*, 988 F.2d 1165, 1171-72 (Fed. Cir. 1993).  Therefore, no construction is required.

The intrinsic evidence – the specification, especially the drawings and accompanying detailed description, and the prosecution history of the '171 Patent – make it clear that the invention is the claimed structure of the heat transfer label, and not its intended use.  The two figures of the '171 Patent depict a heat transfer label alone, with no reference to an article to which the heat transfer label is to be applied.  The portions of the specification cited by Multi-Color in the Joint Claim Construction Statement also support Graphic Packaging's position.  For example, the specification of the '171 Patent discloses that the "microcrystalline wax also promotes adhesion of the label 10 to a nonoxidized article surface."  '171 Patent, col. 7, ll. 1-2.  Such a statement is evidence that the ability to apply labels to untreated (*i.e.*, non-oxidized) articles is merely a result of the claimed structure of the heat transfer label.

Notably, during prosecution of the application that resulted in the '171 Patent, Multi-Color did not rely on the intended use language to distinguish the claimed subject matter from the prior art. Instead, in every Amendment to Multi-Color's patent application submitted to the U.S. Patent and Trademark Office ("PTO"), Multi-Color characterized the invention as follows: "Independent claim 1 is directed to a heat transfer label including a support portion and a transfer portion, wherein the transfer portion includes an adhesive layer having (1) a vinyl acetate resin, (2) a tackifying petroleum hydrocarbon resin, and (3) a microcrystalline wax." *See, e.g.*, Exh. B1, Response to Office Action, December 3, 2008, pg. 10; Exh. B3, Response to Office Action, April 30, 2009, pg. 9; Exh. B4, Request for Continued Examination, June 17, 2009, pg. 9. Conspicuously absent in Multi-Color's own description of the invention submitted to the PTO is the language of intended use present in claim 1. The Patent Examiner also expressed the view that the claims were directed to the structure alone: "As far as how the laminate taught in Magnotta is to be applied to an article, and how that application differs from the present label, it is noted that the instant claims are drawn to the label itself, and not to a final product having the label applied thereto." *See, e.g.*, Exh. B2, Final Office Action, March 18, 2009, pg. 10 (emphasis added).

Here, the intended use – transfer of the label to an article that has not undergone an oxidizing treatment – is possible *because* of the composition of the claimed heat transfer label. *See, e.g.*, '171 Patent, col. 2, ll. 62-65. Thus, it is clear that the recited multi-layered structure completely defines the invention, and that the additional language is simply a statement of intended use and function. Accordingly, this language is not significant to patentability, may be disregarded, and should not be construed. *See Texas Instruments, Inc. v. Int'l Trade Comm'n*, 988 F.2d 1165, 1171-72 (Fed. Cir. 1993).

2.      If construed, this phrase should be given its plain and ordinary meaning.

If the Court does construe this phrase, it should give it its plain and ordinary meaning. Multi-Color's proposed construction is too narrow.  Multi-Color proposes that "article that has not undergone an oxidizing treatment" be construed to mean any "container with a polyethylene, polypropylene, PET, or acrylonitrile surface that typically would be, but has not been, subjected to an oxidizing treatment to promote adhesion."  Multi-Color's proposed construction incorrectly limits the types of objects that can be used with heat transfer labels to a "container."  However, since heat transfer labels do not include a liner like traditional labels, as discussed above in Section II.A, heat transfer labels can be applied to a variety of different objects, including flat objects, round objects, and irregularly shaped objects.  Ansari Decl., ¶ 12.  Accordingly, there is no basis for restricting the use of heat transfer labels to a "container."

Further, Multi-Color's proposed construction unnecessarily limits the claim to a "container" formed from certain materials – polyethylene, polypropylene, PET or acrylonitrile. The plain language of the claim does not support such limitations.  Instead, the language is broad enough to encompass any article, made of any material.  The proposed construction also limits the "article" to one which "typically would be, but has not been" oxidized, a phrase which itself is vague and uncertain.  Thus, the plain and ordinary meaning of the claim language is appropriate.

**E.      Disputed Term: "an article that has not undergone an oxidizing treatment"**

This phrase is simply a segment of the claim phrase in section IV.D above.  Therefore, it is not a claim limitation, should be disregarded and does not require construction for the reasons set forth therein.  In any event, if construed it should be given its plain and ordinary meaning.

**F.      Disputed Term: "microcrystalline wax"**

| Multi-Color's Proposed Construction | Graphic Packaging's Proposed Construction |
|---|---|

| | |
|---|---|
| A wax containing saturated linear and branched hydrocarbon chains and cyclic ring molecules, having a melting point between 145°F and 225°F and needle crystalline structure when solidified. | A wax derived from petroleum and composed of saturated hydrocarbons from between about $C_{34}H_{70}$ to $C_{60}H_{120}$ that have a molecular weight between about 478 and 840, a substantial portion of which are branched and cyclic, and having a crystalline structure that is small and irregular when solidified. In comparison to paraffin wax, microcrystalline wax has a greater portion of cyclic ring molecules, an increased amount of branching, and contains predominantly malcrystalline and needle-like crystals having very small, undefined form when compared with the plate-like crystalline structure of paraffin wax under the same magnification. Hard microwaxes have a melting point between about 190°F - 210°F; the plastic microwaxes a melting point between about 145°F - 175°F; the emulsifiable crystalline waxes between about 190°F - 225°F; and modified microwaxes between about 165°F - 220°F. |

This term appears in independent claim 1 of the '171 Patent and therefore in all claims that Multi-Color asserts are infringed by Graphic Packaging. Because it cannot be disputed that there can be no infringement of the '171 Patent if microcrystalline wax is not used in the adhesive layer of the accused product, Graphic Packaging respectfully submits that this claim term is among the most important of the terms to be construed by the Court. Graphic Packaging's proposed construction is most consistent with both the intrinsic and extrinsic evidence. Indeed, Graphic Packaging's proposed construction is derived almost entirely from the specific language used by the inventor in the specification of the '171 Patent to define microcrystalline wax. Not only is the inventor entitled to be his own lexicographer in describing terms that appear in the claims of a patent, *see In re Glaug*, 283 F.3d 1335, 1340 (Fed. Cir. 2002) (holding that the inventor's lexicography must prevail where a term is defined with specificity in the specification), the specification of the '171 Patent describes important qualities of microcrystalline wax that should be included in any useful definition of microcrystalline wax. *See* Sloat Decl., ¶ 11. In contrast, Multi-Color's proposed construction ignores the specific language of the specification and the

description of numerous important qualities of microcrystalline wax. Instead, Multi-Color suggests a construction that is both inaccurate and overly broad. *See id.* at ¶ 17.

The chemistry of waxes is complex and sometimes involves overlapping physical qualities. Thus, to impart useful information it is necessary to describe a particular class of wax in detail. *See* Sloat Decl.[6], ¶¶ 9-10. The specification of the '171 patent sets forth a number of important characteristics of microcrystalline wax, which alerts one of ordinary skill in the art to what type of wax the patent's disclosure contemplates. *See* Sloat Decl., ¶ 11. Graphic Packaging has incorporated those characteristics in its proposed construction, as shown in the table attached as Exhibit J. Thus, one of ordinary skill in the art would consider Graphic Packaging's proposed construction to be consistent with the characteristics of microcrystalline wax. *See* Sloat Decl., ¶ 6.

        1.    <u>The specification defines microcrystalline wax as a saturated hydrocarbon with particular hydrocarbon chain length and molecular weight ranges.</u>

The '171 Patent states that microcrystalline wax is composed of saturated hydrocarbons from about $C_{34}H_{70}$ to $C_{60}H_{120}$ having a molecular weight between about 478 and 840. '171 Patent, col. 6, ll. 32-46. Hydrocarbons are molecules that include only hydrogen and carbon atoms. Sloat Decl., ¶ 7. For a hydrocarbon to be "saturated," the carbon atoms in the chain must be joined to another with only single bonds. *Id.*

Rather than be silent as to the chemical structure of the saturated hydrocarbon chains of which microcrystalline wax is composed, the inventor alerted one of ordinary skill in the art to the hydrocarbon chain length and molecular weight ranges of microcrystalline wax. These specific ranges were used by the inventor to define microcrystalline wax for purposes of this particular invention. Because the inventor used specific ranges in describing microcrystalline wax, they should be included in the Court's construction of the term. *See In re Glaug*, 283 F.3d at 1340

---

[6] Declaration of Jeffrey T. Sloat, attached hereto as Exhibit I.

(holding that the "patentee may act as his own lexicographer"). Further, one of ordinary skill in the art would consider that those characteristics should be included in the construction of "microcrystalline wax." Sloat Decl., ¶ 12. While Graphic Packaging's proposed construction includes reference to the saturated hydrocarbon chain length and molecular weight ranges set forth in the patent specification, Multi-Color's proposed construction does not and is therefore incorrect. Sloat Decl., ¶ 17.

2. <u>Microcrystalline wax is characterized by substantial proportions of branched and cyclic ring molecules.</u>

Saturated hydrocarbon molecules, also known as alkanes, can be linear, branched, or cyclic. Sloat Decl., ¶ 7. The specification states that microcrystalline waxes "are characterized by an <u>increased amount</u> of branching; although they contain straight chain molecules, they are not as linear a saturated hydrocarbon as paraffin wax. Also compared to paraffin wax, they contain a <u>greater portion</u> of cyclic ring molecules." '171 Patent, col. 6, ll. 37-42 (emphasis added). Furthermore, the chemical encyclopedia cited by Graphic Packaging also describes microcrystalline wax as containing "substantial proportions of branched and cyclic saturated hydrocarbons, in addition to normal alkanes." Exh. K, *Encyclopedia of Chemical Technology*, Vol. 25, Fourth Edition at pp. 618-19. One of ordinary skill in the art would consider the substantial proportion of branched and cyclic ring molecules to be a characteristic that should be included in the construction of "microcrystalline wax." Sloat Decl., ¶ 13. While Graphic Packaging's proposed construction incorporates this distinguishing detail, Multi-Color's proposed construction does not. Multi-Color's proposed construction states that microcrystalline wax is a wax "containing saturated linear and branched hydrocarbon chains and cyclic ring molecules."[7] That proposed construction fails to mention the greater proportions of the branched and cyclic

---

[7] Graphic Packaging notes that Multi-Color's sentence structure may be read to imply that the linear and branched chains are saturated hydrocarbons while the cyclic ring molecules are not. *See* Sloat Decl., ¶ 16.

molecules, *see* Sloat Decl., ¶ 17, and also implies that microcrystalline wax contains molecules other than saturated hydrocarbons.

> 3.  The specification provides a detailed description of the various melting points of microcrystalline waxes, which are absent from Multi-Color's proposed construction.

Both parties include reference to the melting points for microcrystalline wax. Multi-Color's proposed construction simply inserts the lowest and highest temperatures disclosed in the specification and listed the resultant range, 145°F - 225°F, without tying them to the specific ranges for various types of microcrystalline wax described in the specification. The chemical dictionary cited by Multi-Color in the Joint Claim Construction Statement discloses a narrower melting point range for microcrystalline wax (145°F - 190°F), which is inconsistent with the ranges proposed in Multi-Color's proposed construction. Exh. L, *Hawley's Condensed Chemical Dictionary* (14th ed. 2001) at p. 751. On the other hand, Graphic Packaging's proposed construction incorporates the description directly from the specification, in which the inventor chose to describe the various melting point ranges of microcrystalline waxes in detail.

> 4.  The fact that microcrystalline wax is derived from petroleum should be included in the construction of "microcrystalline wax."

Graphic Packaging's proposed construction includes another key characteristic of microcrystalline wax: that it is derived from petroleum. Although not explicitly mentioned in the specification, this fact is a fundamental and distinguishing characteristic that would be understood by one of ordinary skill in the art. It is well-known that microcrystalline wax is derived from petroleum, and such a distinguishing categorical fact should be included in the construction. *See* Sloat Decl., ¶ 14. In fact, a chemical dictionary excerpt cited by Multi-Color in the Joint Claim Construction Statement, as well as an excerpt from a chemical encyclopedia cited by Graphic Packaging, both prominently classify microcrystalline wax as a petroleum-based wax. *See* Exh. L,

*Hawley's Condensed Chemical Dictionary* (14th ed. 2001) at p. 751 ("A hydrocarbon wax obtained from petroleum…"); Exh. K, *Encyclopedia of Chemical Technology*, Vol. 25, Fourth Edition at p. 619 ("Microcrystalline wax is a petroleum wax…"). Multi-Color's proposed definition fails to include this basic classification.

Graphic Packaging's proposed construction of "microcrystalline wax" contains all of the distinguishing characteristics set forth in the specification and understood by one of ordinary skill in the art, and thus should be adopted by the Court. *See* Sloat Decl., ¶ 6. Multi-Color's proposed construction, on the other hand, fails to include any description regarding origin (petroleum), carbon chain length, molecular weight, the proportion of branched and cyclic hydrocarbons, or details regarding melting point ranges. *See* Sloat Decl., ¶ 17. Without such necessary details, Multi-Color's proposed construction is inaccurate and incomplete and should be rejected. *Id.*

G.    **Disputed Term: "release agent"**

| Multi-Color's Proposed Construction | Graphic Packaging's Proposed Construction |
|---|---|
| No Construction Required<br><br>Alternatively, "release agent included in the transfer portion" | release agent included in the protective lacquer layer |

One of ordinary skill in the art must know the location of the release agent in order to understand the claimed invention. This term appears in claims 10 and 11 of the '171 Patent. Graphic Packaging's proposed construction is consistent with the claims and the specification. Release agents are commonly used in a variety of products to facilitate separation or release of one material from another and without specifying the location of the release agent, one of ordinary skill in the art cannot know which materials are intended to be separated from one another. *See* Ansari Decl., ¶ 21. Accordingly, the location of the release agent should be specified.

The specification discloses one embodiment that includes a release agent. In this embodiment, the release agent is added to the protective lacquer layer to "help" the protective lacquer layer of the transfer portion separate from the support portion. '171 Patent, col. 4, ll. 6-8. The specification provides for a release agent to be added to the protective lacquer layer to facilitate the separation. '171 Patent, col. 5, ll. 7-8 ("The protective lacquer layer 24 may include a release agent and at least one of a hard polyester resin or an acrylic resin.").

Multi-Color asserts that no construction is necessary. As explained above, however, one of ordinary skill in the art would not know what materials are to be separated if the specific location for the release agent is not described. Ansari Decl., ¶ 21. Multi-Color argues in the alternative that "release agent" should be construed as "release agent included in the transfer portion." However, that proposed construction does not exclude the possibility of the release agent being included in the ink layer or the adhesive layer, neither of which would achieve the aim of facilitating separation of the transfer portion from the support portion. Graphic Packaging's proposed construction includes the location specified in the '171 patent, and thus it is accurate and should be adopted by the Court. Ansari Decl., ¶ 22.

### H. Disputed Term: "hard polyester resin"

| Multi-Color's Proposed Construction | Graphic Packaging's Proposed Construction |
|---|---|
| polyester polymer that is resistant to surface indentation | copolyester resin having a high tensile strength of 8000 psi, a low elongation of 7%, a 79 D scale Shore Durometer hardness, and a 156°C ring and ball melt flow point |

The '171 Patent provides a clear and detailed description for the term "hard polyester resin" that should be adopted in construing that term as it appears in asserted claim 10, and also in claim 9, of the '171 Patent. Graphic Packaging proposes a construction that is consistent with the claims and the specification, while Multi-Color offers a vague and inaccurate construction.

The term "hard polyester resin" must be clearly defined in order to alert one of ordinary skill in the art what the patentee means. *See* Ansari Decl., ¶ 24. Where a term does not have a plain and ordinary meaning to one of skill in the art, the Court must look to whether the patentee defined the term in the specification. *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). Claim 9 of the '171 Patent defines "hard polyester resin" exactly as the specification does: "a copolyester resin having a high tensile strength of 8000 psi, a low elongation of 7%, a 79 D scale Shore Durometer hardness, and a 156ºC ring and ball melt flow point." '171 Patent, claim 9; col. 5, ll. 8-13. Though asserted claim 10 recites only a "hard polyester resin," it is well-settled that both the asserted claims and claims not asserted should be considered in determining the appropriate construction for a term. *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1352 (Fed. Cir. 2010) ("In addition, 'other claims of the patent…can also be valuable sources of enlightenment as to the meaning of a claim term.'") (citing *Vitrionics Corp. v. Conceptronics, Inc.*, 90 F.3d at 1582). Graphic Packaging's proposed construction incorporates the express definition set forth in the claims and the specification.[8]

Multi-Color's proposed construction is insufficient because it fails to include the details set forth in the claims and the specification, and it also replaces words in need of construction with other words and phrases that are indefinite and require construction. Multi-Color proposes replacing "hard" with "resistant to surface indentation." That proposed phrase raises the question of the degree to which the resin is "resistant to surface indentation" to satisfy the claim limitation. *See* Ansari Decl., ¶ 25. Would the displacement of a single molecule mean that the resin is not resistant to surface indentation? Without still further construction, Multi-Color's proposed substitution for the word "hard" itself lacks certainty and is unhelpful to one of ordinary skill in

---

[8] The specification discloses another example of the composition of a protective lacquer layer. *See* '171 Patent, col. 5, ll. 30-46. The disclosed chemical composition includes a polyester resin (BOSTIK 7922), but it is not described as a "hard polyester resin" in the specification.

the art. Furthermore, Multi-Color's proposed definition incorrectly describes a material that is "hard." *See id.* For instance, a material may be hard but too brittle to withstand a certain degree of surface indentation without breaking. *See id.* Graphic Packaging's proposed construction avoids those pitfalls by including those details set forth in the claims and the specification.

Graphic Packaging respectfully requests that this Court adopt Graphic Packaging's proposed constructions and positions. Graphic Packaging believes that the hearing regarding claim construction, currently scheduled for January 26, 2012, will assist the Court in deciding disputed claim construction issues. The parties have agreed that they will not present live testimony from witnesses at the hearing. Graphic Packaging does intend to present written intrinsic and extrinsic at the hearing.

Dated: November 1, 2011

Respectfully submitted,

s/ T. Earl LeVere
T. Earl LeVere (0063515)
SCHOTTENSTEIN ZOX & DUNN CO., LPA
250 West Street
Columbus, Ohio 43215
Telephone: 614-462-1095
Facsimile: 614-228-4847
E-mail: elevere@szd.com
*Trial Attorney for Defendant and Counterclaimant*
*Graphic Packaging International, Inc.*

OF COUNSEL:

William M. Ragland, Jr.
WOMBLE CARLYLE SANDRIDGE & RICE LLP
271 17th Street, NW
Suite 2400
Atlanta, Georgia 30363-1017
Telephone: 404-888-7466
Facsimile: 404-870-2401
Email: wragland@wcsr.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 1, 2011, the foregoing **Graphic Packaging International, Inc.'s Opening Claim Construction Brief** was filed electronically by Defendant with the Clerk of Court.  Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

s/ T. Earl LeVere<br>
T. Earl LeVere