IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MULTI-COLOR CORPORATION | ) | |
| | ) | Case No. 1:10-cv-280 |
| Plaintiff and Counterclaim Defendant, | ) | |
| | ) | Judge: Dlott |
| vs. | ) | |
| | ) | |
| GRAPHIC PACKAGING INTERNATIONAL, | ) | |
| INC. | ) | |
| | ) | |
| Defendant and Counterclaimant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
OPENING CLAIM CONSTRUCTION BRIEF**

## I.     INTRODUCTION

Pursuant to the Court's May 6, 2011 Scheduling Order, Plaintiff Multi-Color Corporation

("Multi-Color") herein submits its response to Defendant Graphic Packaging, Inc.'s ("GPI")

opening claim construction brief.  It is evident from GPI's Brief that the Parties have approached

claim construction very differently.  GPI's proposed definitions are inconsistent and incompatible

with the claims and the specification of the '171 patent.  Therefore, they are contrary to Federal

Circuit precedent that the claims and specification are highly relevant to the claim construction

analysis, and that disregarding them is impermissible.

The reason for GPI's impermissible approach is glaringly obvious – its proposed

definitions purportedly find support, not from the claims or specification of the '171 patent as

they should, but from the declarations of two employees of *GPI*, the accused infringer.  Making

that inherent bias worse, one of those employees is a former employee of *Multi-Color* who

admittedly had no experience with heat transfer labels prior to being trained for years by *Multi-

Color*.  Significantly, that same individual is the sole person responsible for designing the

1

products accused of infringement. There is no other individual with greater incentive to twist the '171 patent beyond recognition in order to avoid infringement.

As instructed by the Federal Circuit and decades of precedent governing claim construction, Multi-Color has proposed definitions that are derived directly from the claims themselves, in view of the specification. Multi-Color has also attempted to assist the Court by offering the declaration of Dr. Alan Levine, an experienced, and independent, technical expert.

## II. OVERVIEW OF THE '171 PATENT – HEAT TRANSFER LABEL

Heat transfer labels decorate containers. (*See* Exhibit A, the '171 patent, at Col. 1, ll. 11-17). They also provide information about those containers. *Id.* However, prior to the '171 patent, there was a long-felt disadvantage associated with prior heat transfer labels for containers with polyethylene, polypropylene, PET, and/or acrylonitrile surfaces. *Id.* at Col. 2, ll. 4-9. Prior heat transfer labels would not adhere to those particular containers unless the surface had been treated by a time consuming and expensive oxidizing technique, such as flaming. *Id.*

The precise invention claimed in the '171 patent, as is expressly disclosed therein, is a heat transfer label that overcomes the drawbacks described with prior heat transfer labels used on polyethylene, polypropylene, PET, and/or acrylonitrile surfaces. That novel heat transfer label includes (a) a support portion and (b) a transfer portion over the support portion for transfer of the transfer portion from the support portion to an article upon application of heat to the support portion, while the transfer portion is placed into contact with the article. *Id.* at Col. 2, ll. 45-55. The transfer portion includes an adhesive layer comprising a vinyl acetate resin, a tackifying petroleum hydrocarbon, and a microcrystalline wax. *Id.*

As a result, the "present invention" claimed in the '171 patent is a heat transfer label that can bond to nonoxidized polyethylene, polypropylene, PET, and acrylonitrile containers. *Id.*

2

("The present invention overcomes the drawbacks described above by providing a heat transfer label…"). The need for surface pretreatment of the polyethylene, polypropylene, PET, and acrylonitrile surface is thereby eliminated. *Id.* at Col. 2, ll. 62-65. Thus, the invention is, expressly, a heat transfer label that can bond to nonoxidized polyethylene, polypropylene, PET, and acrylonitrile containers. Any other summary twists the '171 patent into something it is not.

The summary of the '171 patent presented by GPI in its Opening Brief begs clarification. First, contrary to the statements in GPI's Opening Brief, the '171 patent describes heat transfer labels as "multilayered laminates." *Id.* at Col. 1, ll. 19-20. Thus, GPI's decision to cite to the '171 patent in support of its statement that "[t]he '171 patent relates to multi-layered structures" is, at its best, inaccurate. One reviewing GPI's statement and the citation would come away with the understanding that the '171 patent references "multi-layered structures." It does not.

Second, GPI states that "[t]ypically, the transfer portion includes a protective layer…," and proceeds again to cite to a specific portion of the '171 patent. What GPI fails to disclose, and would not otherwise be understood from GPI's statement, is that the '171 patent discloses and claims a heat transfer label that may, but does not necessarily include, a protective layer. *Id.* at Col. 2, ll. 55-56; Col. 3, ll. 48-49 ("The transfer portion 14 <u>may</u> include a protective lacquer layer…"). Indeed, Claim 1 of the '171 patent calls for a transfer portion including at least an ink layer and an adhesive layer, whereas Claim 8 calls for a transfer portion that <u>further</u> comprises a protective lacquer layer. *Id.* at Col. 9, ll. 51-55; Col. 10, ll. 20-21.

## III.   LEGAL STANDARDS FOR CONSTRUING CLAIMS

### A.   The Claim Terms And Specification Are The Primary Resource

The Parties do not dispute that, in construing claims, the Court must look first to the language of the claims themselves. *See, e.g., Middleton, Inc. v. Minnesota Mining & Mfg. Co.,*

311 F.3d 1384, 1387 (Fed. Cir. 2002). The Parties also do not dispute that the claims do not

stand alone, and "must be read in view of the specification of which they are a part." *Phillips v.*

*AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (*en banc*). In fact, GPI relies upon case law,

correctly, for the proposition that the claims must be construed in a manner consistent with the

specification. (*See* Dkt. 35 (GPI's Opening Brief), at p. 4; *citing Merck & Co., Inc. v. Teva*

*Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003)). While GPI mentions these rules,

Multi-Color submits that GPI's proposed definitions directly violate them.

   B.    **The "Present Invention" Limits Claim Scope And Should Be Construed**

   GPI does not and cannot dispute that when the specification of a patent describes the

"present invention," the Federal Circuit has stated unequivocally, and repeatedly, that the

invention is limited to that "present invention." *Verizon Services Corp. v. Vonage Holdings*

*Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007); *see also MBO Labs, Inc. v. Becton, Dickinson &*

*Co.*, 474 F.3d 1323, 1330 (Fed. Cir. 2007). It is error not to construe the claims accordingly. *Id.*

   This rule applies to the claim terms "heat transfer label" and "an article that has not

undergone an oxidizing treatment." The specification expressly states that the problem being worked

on, and the "present invention" that solves this problem, is a novel "heat transfer label" for

"containers" having "a polyethylene, polypropylene, PET, and/or acrylonitrile surface" that have

not undergone an oxidizing treatment. (*See* Exhibit A, at Col. 1, ll. 5-7; Col. 2, ll. 5-10, 46-47,

62-63). Because these excerpts from the '171 patent describe the "present invention" as a novel

"heat transfer label" and "an article that has not undergone an oxidizing treatment," these claim

terms should be construed. *Corning Glass Works v. Sumitomo Electric U.S.A., Inc.*, 868 F.2d 1251,

1257 (Fed. Cir. 1989); *see also American Imaging Servs., Inc. v. Intergraph Corp.*, Case No. 99-1485,

2000 U.S. App. LEXIS 13949, at * 14-15 (Fed. Cir. June 12, 2000).

4

**C.     A Preamble That Recites The "Present Invention" Limits Claim Scope And Should Be Construed**

A preamble that "give[s] life, meaning, and vitality to the claim" must be construed. *MEMS Technology Berhad v. Knowles Electronics LLC*, Case No. 2010-1018, 2011 U.S. App. LEXIS 11350, at *13 (Fed. Cir. June 3, 2011) (*citing Corning Glass*, 868 F.2d at 1257). Notably, to make this determination, the Court must determine what the inventors actually invented. *Id.* If what the inventors actually invented appears in the preamble, it gives life and meaning to the claim and must be construed:

> The effect of the preamble language…can be resolved only on review of the entirety of the patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim.

*Id.*

In addition, when the preamble recites structure that is "underscored as important by the specification," the preamble limits the claim. *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004). Otherwise stated, "a preamble limits the invention if it recites essential structure…" *Vizio, Inc. v. Funai Electric Co., Ltd.*, 605 F.3d 1330, 1340 (Fed. Cir. 2010). That is because a preamble reciting the invention is a fundamental characteristic of the claimed invention that must be construed as a limitation. *Id.*

Also, a preamble that requires the components listed in the claim body to come together to form a particular structure limits the claimed invention. For example, when a preamble recites a "microelectromechanical system package," and subsequently lists in the claim body the features that comprise that package, the preamble is a limitation. That makes the preamble an "important characteristic of the claimed invention" and therefore "adds a limitation that is not otherwise present in the claim and is necessary to give meaning to the claim." *MEMS Technology*, 2011 U.S. App. LEXIS 11350, at *26 (*citing Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*,

5

289 F.3d 801, 808 (Fed. Cir. 2002)). Such a preamble is "intimately meshed with the ensuing language in the claim," and is therefore a limitation that should be construed. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1306 (Fed. Cir. 1999).

Finally, while the claim terms at issue do not employ functional language, even if they did the terms would still have to be construed as limiting the scope of the invention. *K-2 Corp. v. Salomon S.S.*, 191 F.3d 1356, 1363 (Fed. Cir. 1999) ("The functional language is, of course, an additional limitation in the claim."); *see also Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1443-44 (Fed. Cir. 1997) (functional language analyzed as a claim limitation).

The law cited (perhaps unwittingly) by GPI strongly supports *Multi-Color's* position that the preamble should be construed. For example, *Chisum on Patents* unequivocally provides that:

> [T]he Court notes that the Federal Circuit has clearly held that limitations may be functional and has never stated that a limitation articulated in functional terms may not appear in the preamble.

*Chisum on Patents*, § 8.06[1][b][i]. *Chisum on Patents* then summarizes Federal Circuit precedent emphasizing that structure appearing in the preamble, like "heat transfer label" here, is limiting. *Id.*

GPI also (unwittingly) refers the Court to *Marrin v. Griffin*, 599 F.3d 1290 (Fed. Cir. 2010). In *Marrin*, the patentee used both structural terms and a statement of intended use in the preamble. *Id.* at 1295. The Federal Circuit determined that the structural terms were part of the claim and limiting, while the statement of intended use was not. *Id.* Here, the claims of the '171 patent do not recite a statement of intended use in the preamble, so *Marrin* is not applicable to that extent. However, to the extent the preamble refers to the structural term "heat transfer label," according to *Marrin*, that term is limiting and must be construed. *Id.*[1]

---

[1] GPI's last ditch effort is to incorrectly refer the Court to cases in which a preamble discloses "laudatory" terms, and terms that disclose nothing more than intended use in the preamble. For example, GPI refers the Court to *Allen Eng'g.*, in which the preamble provided "[a] self-propelled, fast steering motorized riding trowel…". *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346-47 (Fed. Cir. 2002). The Federal Circuit agreed that the term

## IV.  THE DISPUTED CLAIM TERMS OF THE '171 PATENT

### 1. heat transfer label:

| Multi-Color's Proposed Construction | GPI's Proposed Construction |
|---|---|
| a multi-layered laminate which through the application of heat is adhered to an object and provides decoration or information about it | A multi-layered structure. |

a.  <u>A novel "heat transfer label" is the "present invention" and should be construed.</u>

The specification of the '171 patent expressly states that the particular problem being worked

on by the inventor were failures of prior heat transfer labels, as they would not adhere to

particular types of containers.  That problem is recited in the specification as follows: "One

disadvantage associated with the use of the aforementioned label, and similar <u>heat transfer labels,</u>

<u>on polyethylene, polypropylene, PET, and/or acrylonitrile,</u> is that <u>the label will not adhere to a</u>

<u>polyethylene, polypropylene, PET, and/or acrylonitrile surface</u> unless the surface has been treated

by some oxidizing treatment." (*See* Exhibit A, at Col. 2, ll. 5-10).

The specification also expressly states that the solution, referred to as the "present

invention," is a novel heat transfer label:

> Thus, it would be desirable to provide a heat transfer label that is particularly well
> suited for use on untreated polyethylene, polypropylene, PET, and/or acrylonitrile
> surfaces…The adhesive of the label of the present invention can bond to
> nonoxidized polyethylene, polypropylene, PET, and/or acrylonitrile surfaces, and
> thus allows for the elimination of surface pretreatment of the article being labeled.

*Id.* at Col. 2, ll. 36-38, 62-65.

The solution to this problem associated with prior heat transfer labels is a novel heat

transfer label: "The <u>present invention</u> relates generally to <u>labels</u>…and relates more specifically to

<u>heat transfer labels</u> for articles, such as <u>containers</u>." *Id.* at Col. 1, ll. 5-7; *see also* Col. 2, ll. 46-47,

---

"fast steering" was merely laudatory and did not give life to the claimed structure.  *Id.* at 1347.  There is no such
laudatory term at issue here.  Also notable is the fact that the Federal Circuit did not rule that the structural term

62-63 ("The <u>present invention</u>…provid[es] a <u>heat transfer label</u>…"; "The adhesive of the <u>label of the present invention can bond to nonoxidized polyethylene, polypropylene, PET, and/or acrylonitrile</u>…") (emphasis added).

For this reason alone, and contrary to GPI's argument, it matters not that the term "heat transfer label" appears in the preamble.  This term is the very essence of the "present invention," and should be construed. *Verizon Services*, 503 F.3d at 1308; *MBO Labs*, 474 F.3d at 1330.

　　b.　　<u>The '171 patent repeatedly underscores a "heat transfer label" as essential to the invention and a fundamental characteristic of it.</u>

GPI contends that "heat transfer label" is not important to the '171 patent, and should not be defined.  Given that there are approximately fifty (50) references to a "heat transfer label" in the specification, and not a single reference to the definition proposed by GPI (*i.e.*, "multi-layered structure"), GPI's contention is not credible.

The inventor of the '171 patent repeatedly disclosed what he invented and what he intended to be encompassed by the claims.  That is, he invented a novel heat transfer label that is repeatedly described as having the ability to bond to "containers" with "nonoxidized polyethylene, polypropylene, PET, and/or acrylonitrile surfaces." (*See* Exhibit A, at Col. 1, ll. 5-7; *see also* Col. 2, ll. 46-47, 62-63).  Indeed, "[w]hat is claimed is [a] heat transfer label…" Because the entirety of the '171 patent, including the Title, Abstract, Field of Invention, Background of the Invention, Summary of the Invention, Brief Description of the Drawings, Detailed Description of the Invention, and the Claims all describe the invention as a novel heat transfer label, that is precisely what was invented.  Therefore, for this additional reason, the term "heat transfer label" should be construed. *Poly-America*, 383 F.3d at 1310.

---

"riding trowel" did not limit the claimed invention.

For similar reasons, there also can be no doubt that the '171 patent makes it repeatedly clear that a novel "heat transfer label" is essential to the claimed invention. The specification and its repeated references to a novel heat transfer label that solves long-felt problems with prior heat transfer labels confirms the importance of a "heat transfer label" to the invention. That is, in fact, the invention. For this additional reason it limits the scope of the invention. *Poly-America*, 383 F.3d at 1310 (preamble structure that is "underscored as important by the specification" limits the claim); *Vizio*, 605 F.3d at 1340 ("a preamble limits the invention if it recites essential structure").

Also, the preamble requires that the components listed in the claim body come together to form a heat transfer label. The preamble provides that a "heat transfer label" is required, and the remainder of the claim refers to "a <u>transfer</u> portion" that is transferred "upon application of <u>heat</u>." The preamble "heat transfer label" is intimately tied to the remainder of the claim, and is therefore an "important characteristic of the claimed invention" and "adds a limitation that is not otherwise present in the claim and is necessary to give meaning to the claim." *MEMS Technology*, 2011 U.S. App. LEXIS 11350, at *26(*citing Catalina Marketing*, 289 F.3d at 808).

In view of the repeated disclosures in the '171 patent that a "heat transfer label" is the invention itself, and is a fundamental characteristic of the claimed invention, it is properly construed as a limitation.

c. <u>Multi-Color's proposed definition is accurate and complete; GPI's proposal ignores the essence of what a heat transfer label is.</u>

Because the term "heat transfer label" is the "present invention," it limits the invention and should be construed. Multi-Color submits that its proposed definition accurately and completely defines each part of that term. GPI's proposed definition, on the other hand, ignores "heat transfer" and "label" altogether.

As described in the Background of the Invention section of the specification of the '171 patent, heat transfer labels are "multilayered laminates" that are subjected to heat. (*See* Exhibit A, at Col. 1, ll. 19-20, 27-30). "When subjected to heat…the adhesive layer adheres the ink design layer to an article being labeled." *Id.* at Col. 1, ll. 27-30. Thus, Multi-Color's proposed definition, which incorporates "multi-layered laminates," and "through the application of heat is adhered to an object," is consistent with the specification.[2] Those terms are understandable to one of ordinary skill in the art, and to the Patent Examiner, who reviewed the application that issued as the '171 patent and repeatedly relied upon the term "laminate." (*See* Exhibit B, Declaration of Mr. Jean Paul Laprade, at ¶ 9; *see* Exhibit C, excerpts of prosecution history).

The specification provides that a label is used in the "decorating and/or labeling of containers," and for providing "information." (*See* Exhibit A, at Col. 1, ll. 11-16). This disclosure in the specification is consistent with THE NEW OXFORD AMERICAN DICTIONARY (2d ed. 2005), which defines a label as "attached to an object and giving information about it." (*See* Exhibit D, at p. 943). Thus, Multi-Color's proposal, which incorporates "provid[ing] decoration or information about it," is consistent with the specification and the ordinary meaning of "label."

Because of what a "label" is, *i.e.*, a thing providing decoration or information," it must be recognized that not all laminates are "labels." For example, a sandwich is a "multi-layered structure," but it would be absurd to suggest that such a "multi-layered structure" is a "label." Rather, laminates are only labels if they are used for "decorating" or if they are "giving information about" the article to which they are adhered, as recited in the specification. (*See* Exhibit A, at Col. 1, ll. 11-16).

---

[2] GPI criticizes Multi-Color's proposed definition because it mentions heat, but not pressure between the label and container. (Dkt. 35, at p. 7). The claim term "heat transfer label" itself justifies, and in fact mandates, "heat." In addition, Claim 1 recites "upon application of heat," further requiring that this claim term be construed to

Multi-Color's proposed definition is not only consistent with the specification and claims. It is also consistent with the understanding of one of ordinary skill in the art. One of ordinary skill in the art would readily understand that a heat transfer label is a "multi-layered laminate," especially given that the phrase is used in the specification. (*See* Exhibit B, Laprade Decl., at ¶ 9). Because the claim term "heat transfer label" expressly calls for the application of heat, one of ordinary skill in the art would understand that it is, through the application of heat, adhered to an object. *Id.* at ¶ 11. Finally, because the specification describes labels as "decorating and/or labeling," and as providing "information," one of ordinary skill in the art would understand that a label "provides decoration or information about the object (and potentially its contents)." *Id.*

GPI's proposal, on the other hand, ignores the claim terms themselves and the specification. "Multi-layered structure" fails to define a label, and fails to identify that the invention of the '171 patent is a novel "heat transfer" type of label. In addition, the phrase "multi-layered structure" is entirely absent from the '171 patent.[3] It is also contrary to the understanding of a person of ordinary skill in the art, who would not ignore the requirement that a "heat transfer label" be a "label" and that it be based on "heat transfer." *Id.* at ¶ 10. One of ordinary skill in the art also would not ignore the specification, which requires that a "heat transfer label" be a "label" and that it be based on "heat transfer." *Id.*

**2. support portion:**

| Multi-Color's Proposed Construction | GPI's Proposed Construction |
|---|---|
| carrier sheet and release portion | carrier sheet and release layer |

---

incorporate "heat." Pressure between the label and container is contemplated as a part of the invention. (*See* Exhibit A, at Col. 1, ll. 36-39).

[3] Tacitly conceding that its proposal fails to address the term "label" and is therefore incomplete, GPI alternatively suggests that a "label" may provide information about the contents of the object in addition to the object itself. (Dkt. 35, at p. 6). Multi-Color submits that its proposed definition, which incorporates "provid[ing] decoration or information about [the object]," encompasses information about the object or its contents.

The only difference between the Parties' proposed definitions for this claim term is that Multi-Color refers to a "release portion," while GPI refers to a "release layer."  Multi-Color's proposal stems directly from the Detailed Description of the Invention, while GPI relies solely upon the portion of the specification describing the background of heat transfer labels generally. GPI's proposal is also inconsistent with the remainder of the specification.

In particular, according to the Detailed Description of the Invention, the "support portion" is defined as "include[ing] a carrier sheet 18…and a release portion 16." (*See* Exhibit A, at Col. 3, ll. 31-34) (emphasis added).  That section of the specification repeatedly refers to the "release portion."  *Id.* at Col. 3, ll. 35-36; Col. 3, ll. 65-67; Col. 3, ll. 67 – Col. 4, ll. 1.

GPI's proposal not only lacks support from the Detailed Description of the Invention, but is directly inconsistent with it.  For example, GPI's proposal ignores several embodiments described in the specification wherein the support portion includes a release portion, and not the entire release layer, because a portion of the release may transfer. (*See* Exhibit B, Laprade Decl., at ¶ 13).  One of ordinary skill in the art would understand that the '171 patent describes the support portion as including a release portion, and not the entire release layer, because a portion of the release may transfer. *Id.*  Any other understanding would be directly contrary to the express statements and embodiments described in the specification. *Id.*  One of ordinary skill in the art would not have an understanding directly contrary to the express statements in the specification, and GPI's proposal is therefore incorrect. *Id.*

GPI's proposal is also inconsistent with Claim 17 of the '171 patent. *Id.* at ¶ 14.  Claim 17 recites that a release layer is not a part of the support portion, but rather is "interposed between said support portion and said transfer portion." *Id.*  Thus, GPI's proposal, which requires

12

the release layer to be part of the support portion, as opposed to being between the support portion and another portion, is incorrect.

### 3. transfer portion:

| Multi-Color's Proposed Construction | GPI's Proposed Construction |
|---|---|
| a portion that includes an ink layer and an adhesive layer | the portion that includes the protective lacquer layer, ink layer, and adhesive layer, but does not include the carrier sheet or release layer |

The only difference between the Parties' proposed definitions for this claim term is that GPI's proposal requires the transfer portion to "include[ ] the protective lacquer layer" and "not include the carrier sheet or release layer." Multi-Color submits that both of GPI's proposed additions are directly inconsistent with the claims and specification of the '171 patent, and are contrary to the understanding of one of ordinary skill in the art.

With respect to GPI's proposal that the "transfer portion" include a "protective lacquer layer," Claim 1 provides that the transfer portion need only include "an ink layer; and an adhesive layer." (*See* Exhibit A, at Col. 9, ll. 44-54). Entirely absent from the "transfer portion" is a protective lacquer layer. *Id.* Because Claim 8 provides that the transfer portion may further comprise a protective lacquer layer, it is expressly clear that that term, as used in Claim 1, does not and cannot require a protective lacquer layer. For this reason alone, GPI's proposal that the transfer portion include the protective lacquer layer is inconsistent with the claims.

It would also be inconsistent with Claim 8 to define "transfer portion" as requiring a protective lacquer layer. Such a definition would render Claim 8, and its further requirement of a protective lacquer layer, superfluous. Otherwise stated, if "transfer portion" is defined as requiring a protective lacquer layer, then Claim 8 would effectively read as follows: "The heat transfer label of claim 1, wherein said [portion that includes the <u>protective lacquer layer</u>, ink layer, and adhesive layer] further comprises a <u>protective lacquer layer</u>." Such a definition is, on

its face, improper.  *See Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 885 (Fed. Cir. 2008) (refusing to adopt a claim construction which would render a claim limitation meaningless); *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1305-07 (Fed. Cir. 2000). Such a definition is also inconsistent with the understanding of a person of ordinary skill in the art, who would understand that Claim 1 does not require the transfer portion to include a protective lacquer layer. (*See* Exhibit B, Laprade Decl., at ¶ 15).

As noted above in connection with the claim term "support portion," the '171 patent provides that some of the release portion may transfer.  Specifically, "[d]uring label transfer, a small portion of the skim coat 22 may be transferred along with the transfer portion 14 of the label 10 onto the article being labeled." (*See* Exhibit A, at Col. 3, ll. 42-45).  Other embodiments are also described as having a portion of the support portion transfer. *Id.* at Col. 1, ll. 19-35; Col. 4, ll. 27-30.  Because the '171 patent describes embodiments wherein some of the release portion transfers, it is incorrect to construe "transfer portion" as excluding the release portion.

### 4-5.  an article that has not undergone an oxidizing treatment:

| Multi-Color's Proposed Construction | GPI's Proposed Construction |
|---|---|
| a container with a polyethylene, polypropylene, PET, or acrylonitrile surface that typically would be, but has not been, subjected to an oxidizing treatment to promote adhesion. | Not a claim limitation.  In any event, no further construction is needed because the terms/phrase may be understood using their plain meaning. |

GPI's sole argument is that this claim term does nothing more than state an intended use, and is therefore not part of the claimed invention.  GPI's argument is both wrong and irrelevant. GPI's argument is wrong because the Federal Circuit has repeatedly made it clear that all claim terms, including "an article that has not undergone an oxidizing treatment," do in fact limit the scope of the inventions claimed in the '171 patent.  *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of

the claim is preferred over one that does not do so."); *see also Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) (Claims must be "interpreted with an eye toward giving effect to all terms in the claim.").

GPI's argument is irrelevant, because even if this claim term was a statement of intended use (which it is not), it still is a claim limitation. *K-2 Corp. v. Salomon S.S.*, 191 F.3d 1356, 1363 (Fed. Cir. 1999) ("The functional language is, of course, an additional limitation in the claim."); *see also Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1443-44 (Fed. Cir. 1997) (functional language analyzed as a claim limitation).[4]

This claim term is not a statement of use because the '171 patent describes the very nature of the "present invention" as solving the problem of heat transfer labels that will not adhere to polyethylene, polypropylene, PET, and/or acrylonitrile, unless the surface has been treated by some oxidizing treatment. (*See* Exhibit A, at Col. 2, ll. 5-10).  The solution posed by the inventor of the '171 patent makes it undeniably clear that this claim term is part of the "present invention," and therefore limits the claimed inventions and should be construed:

> Thus, it would be desirable to provide a heat transfer label that is particularly well suited for use on untreated polyethylene, polypropylene, PET, and/or acrylonitrile surfaces…The adhesive of the label of the present invention can bond to nonoxidized polyethylene, polypropylene, PET, and/or acrylonitrile surfaces, and thus allows for the elimination of surface pretreatment of the article being labeled.
>
> *         *         *
>
> The adhesive of the label of the present invention can bond to nonoxidized polyethylene, polypropylene, PET, and acrylonitrile surfaces, and thus allows for the elimination of surface pretreatment of the article being labeled. In addition to

---

[4] The purported legal support GPI relies upon for its proposition that statements of intended use are not part of the claimed invention is *Marrin v. Griffin* and *Texas Instruments, Inc. v. Int'l Trade Comm'n*.  For reasons not disclosed by GPI in its Brief, both *Marrin* and *Texas Instruments* are distinguishable.  *Marrin* is strictly limited to statements of intended use appearing in the preamble. *Marrin v. Griffin*, 599 F.3d 1290, 1294 (2010).  *Texas Instruments* is strictly limited to claim language beginning with the term "whereby." *Texas Instruments, Inc. v. Int'l Trade Comm'n*, 988 F.2d 1165, 1171-72 (Fed. Cir. 1993).  In its Brief, GPI failed to disclose these distinguishing facts, none of which are present here in connection with the claim term "an article that has not undergone an oxidizing treatment."

being directed to the above-described heat transfer label, the present invention is
also directed to a method of labeling an untreated polyethylene, polypropylene,
PET, or acrylonitrile surface with the above-described heat transfer label.

*Id.* at Col. 2, ll. 36-38; Col. 2, ll. 62 – Col. 3, ll. 2.

The Federal Circuit has stated unequivocally, and repeatedly, that patents are limited to

what they describe as the "present invention." *Verizon Services Corp. v. Vonage Holdings Corp.*,

503 F.3d 1295, 1308 (Fed. Cir. 2007); *see also MBO Labs, Inc. v. Becton, Dickinson & Co.*, 474

F.3d 1323, 1330 (Fed. Cir. 2007).  And so, the '171 patent is limited to what it describes as the

"present invention."  It is error not to construe the claim terms accordingly. *Id.*[5]

**6.  microcrystalline wax:**

| Multi-Color's Proposed Construction | GPI's Proposed Construction |
|---|---|
| a wax containing saturated linear and branched hydrocarbon chains and cyclic ring molecules, having a melting point between about 145ºF and 225ºF and needle crystalline structure when solidified. | A wax derived from petroleum and composed of saturated hydrocarbons from $C_{34}H_{70}$ to $C_{60}H_{120}$ that have a molecular weight between about 478 and 840, a substantial portion of which are branched and cyclic, and having a crystalline structure that is small and irregular. In comparison to paraffin wax, microcrystalline wax has a greater portion of cyclic ring molecules, an increased amount of branching, and contains predominantly malcrystalline and needle-like crystals having very small, undefined form when compared with the plate-like crystalline structure of paraffin wax under the same magnification. Hard microwaxes have a melting point between about 190º F.-210º F.; the plastic microwaxes a melting point between about 145º F.-175º F.; the emulsifiable crystalline waxes between |

---

[5] GPI's reference to the prosecution history regarding this claim term does not overcome the fact that the inventor expressly indicated, repeatedly, that the present invention is a heat transfer label that adheres to an article that has not undergone an oxidizing treatment.  GPI's references relate only to the inventor's (successful) attempts to distinguish the claims of the '171 patent over the Magnotta reference.  Magnotta is distinguishable from the claims of the '171 patent for several reasons, such that it was not necessary to distinguish it based on adherence to an article that has not undergone an oxidizing treatment.  Still, the inventor did distinguish Magnotta based on the fact that Magnotta would not remain adhered to an article. (*See* Exhibit E, at MUCC 185, MUCC 212).  Notably, the Patent Examiner agreed and allowed the '171 patent over the Magnotta on this and other bases.  (*See* Exhibit F, at MUCC 229).

| | about 190º F.-225º F.; and modified microwaxes between about 165º F.-220º F. |
| --- | --- |

While the claims, including the term "microcrystalline wax," must be construed in a manner consistent with the specification, the Federal Circuit has expressly rejected the contention that a claim should be construed as being limited to a particular embodiment. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (*en banc*). The claims cannot be construed as being limited to a particular embodiment even if it is described as a preferred or only embodiment. *Id.*; *The Laryngeal Mask Co. v. AMBU A/S*, 618 F.3d 1367, 1372 (Fed. Cir. 2010).

Against this undisputed precedent governing claim construction, GPI's proposed definition for the term "microcrystalline wax" is improper for at least four independent reasons. First, GPI admits that it "cut and pasted" its proposed definition directly from the embodiment disclosed in the specification of the '171 patent. This is impermissible, as it would limit the claim to a particular embodiment described in the specification. *Id.*

Second, the embodiment described in the specification suggests how microcrystalline waxes are characterized, rather than limiting them to a particular embodiment. For example, the specification discloses that "[m]icrocrystalline waxes characteristically contain…" and [m]icrocrystalline waxes (microwaxes) are characterized by…" (*See* Exhibit A, at Col. 6, ll. 35-39). Thus, even if it were proper to limit a claim to a particular embodiment (which it is not), the specification discloses what "characteristically" is a microcrystalline wax. In particular, an embodiment described in the specification suggests that microcrystalline waxes "characteristically contain" between about $C_{34}$ to $C_{60}$ carbon chains. *Id.* However, a particular number of carbon chains does not provide a reliable definition as to whether a wax is a paraffin wax or a microcrystalline wax. (*See* Exhibit G, Levine Decl., at ¶ 5). In fact, based on the description in the specification that a microcrystalline wax merely "characteristically contains" a

particular range of carbon chains, one of skill in the art would not rely upon the number chains bearing a particular carbon number as a factor defining the scope of a microcrystalline wax. *Id.* at ¶ 7. GPI's "employee/expert" tacitly admits this by conceding that waxes have overlapping qualities, thereby precluding comprehensive, exclusionary definitions. (Dkt. 35-9, at ¶¶ 9-10).

Third, GPI unnecessarily injects the phrase "a substantial portion of which are branched and cyclic" and "derived from petroleum" into its proposed definition. There is nothing to justify GPI's proposal, and it is contrary to the understanding of a person of ordinary skill in the art. (*See* Exhibit H, Levine Decl., at ¶ 13). If a microcrystalline wax is derived from petroleum, then it is not necessary to include that characteristic in the definition. That it should not be included is supported by its absence from the specification.

Fourth, GPI's proposed definition does not provide the Court or ultimately the jury any guidance or instruction as to the meaning of this term above and beyond the specification. One of ordinary skill in the art would not understand the term "microcrystalline wax" as proposed by GPI to be helpful above and beyond the specification. *Id.* at ¶ 12.

Multi-Color's proposed definition, on the other hand, is a direct excerpt from Column 6 of the specification, assists the Court and ultimately the jury, and does not inappropriately limit the claim term to a particular embodiment.

### 7. release agent:

| Multi-Color's Proposed Construction | GPI's Proposed Construction |
|---|---|
| No construction required. Alternatively, "release agent included in the transfer portion." | release agent included in the protective lacquer layer |

It is Multi-Color's position that the claim term "release agent" may be understood using its plain meaning, and therefore need not be construed. In the alternative, clear from Claims 8 and 10 is the fact that the "release agent" is an agent that is included in the transfer portion.

Equally clear is that the "release agent" need not necessarily be located in the protective lacquer layer, which may be another component of the transfer portion. That is, Claim 10 incorporates the limitations of Claim 8, which includes a transfer portion that comprises, among other things, a protective lacquer layer. In view of this, does Claim 10 call for the release agent to be included within the protective lacquer layer of the transfer portion? No. To the contrary, Claim 10 only requires the release agent to be included in the transfer portion. Any other interpretation would needlessly import the limitation of a release agent being located in a particular portion of the transfer portion, and there is no claim language that would justify such a construction.

Despite these facts, GPI would have the Court adopt a definition that needlessly imports the limitation of a release agent being located in a particular portion of the transfer portion. This is simply wrong. It is also contrary to the understanding of a person of ordinary skill in the art. (*See* Exhibit B, Laprade Decl., at ¶ 16).

In fact, it is wholly incorrect to require the "release agent" to be located in the protective lacquer layer. That is because the specification and claims of the '171 patent describe an embodiment wherein the protective lacquer layer is not present at all. Specifically, Claim 8 depends from Claim 1 and requires the transfer portion to further comprise a protective lacquer layer. Thus, Claim 1 need not have a protective lacquer layer at all. (*See* Exhibit A, at Col. 2, ll. 55-57). Thus, GPI's proposed definition is contrary to certain embodiments disclosed in the specification, and is contrary to the understanding of a person of ordinary skill in the art. (*See* Exhibit B, Laprade Decl., at ¶ 17).

**8. hard polyester resin:**

| Multi-Color's Proposed Construction | GPI's Proposed Construction |
| --- | --- |
| polyester polymer that is resistant to surface indentation | copolyester resin having a high tensile strength of 8000 psi, a low elongation of 7%, a 79 D scale Shore Durometer hardness, |

| | and a 156°C ring and ball melt flow point |
|---|---|

Claims 9 and 10 of the '171 patent bear on the claim term "hard polyester resin."  A particular example of a hard polyester resin is claimed in Claim 9.  It is equally clear from Claim 10 that a hard polyester resin need not be, and in fact cannot be, limited to the particular example recited in Claim 9.  This conclusion is also mandated by the specification, which discloses additional examples of a hard polyester resin different than that claimed in Claim 9: "BOSTIK 7922 polyester resin…having a hardness of 65 Shore A…" *Id.* at Col. 5, ll. 30-33.  Thus, GPI's proposed definition is contrary to the specification and to the understanding of one of ordinary skill in the art. (*See* Exhibit B, Laprade Decl., at ¶¶ 18-19).

The proper construction for this term is a "polyester polymer that is resistant to surface indentation."  A "resin" in this context has been defined in terms of a "polymer." (*See* Exhibit I: resin: "…polymer used as the basis of plastics, adhesives, varnishes, or other products.").  Next, a premier treatise of composites, The Engineered Materials Handbook, Vol. 1 (Composites), defines hardness as "the resistance to surface indentation." (*See* Exhibit J).  For these reasons, Multi-Color proposes that the term "hard polyester resin" should be defined as "polyester polymer that is resistant to surface indentation."  That definition is consistent with the specification, the extrinsic evidence, and the understanding of a person of ordinary skill in the art. (*See* Exhibit B, Laprade Decl., at ¶¶ 19-21).

Respectfully submitted,

MULTI-COLOR CORPORATION

Dated: December 5, 2011    s/ Brett A. Schatz
           Brett A. Schatz (0072038)
           bschatz@whepatent.com
           Paul J. Linden (0083699)
           plinden@whepatent.com
           Trial Attorneys
           WOOD, HERRON & EVANS, L.L.P.
           441 Vine Street, 2700 Carew Tower
           Cincinnati, Ohio 45202-2917
           (513) 241-2324
           (513) 241-6234 (Facsimile)

           Attorneys for Multi-Color Corporation

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 5, 2011, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to the

following:  T. Earl LeVere, William M. Ragland, Jr., James F. Vaughan, Preston H. Heard, and

James M. Lennon.

<div style="margin-left:50%">

s/ Brett A. Schatz
Brett A. Schatz (0072038)
bschatz@whepatent.com
Paul J. Linden (0083699)
plinden@whepatent.com
Trial Attorneys
WOOD, HERRON & EVANS, L.L.P.
441 Vine Street, 2700 Carew Tower
Cincinnati, Ohio 45202-2917
 (513) 241-2324
 (513) 241-6234 (Facsimile)
Attorneys for Multi-Color Corporation

</div>