**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| MULTI-COLOR CORPORATION, | ) | |
| | ) | |
| Plaintiff and Counterclaim Defendant, | ) | |
| | ) | Case No. 1:10-cv-280 |
| v. | ) | |
| | ) | Judge: Dlott |
| GRAPHIC PACKAGING INTERNATIONAL,) | | |
| INC., | ) | |
| | ) | |
| Defendant and Counterclaimant. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**GRAPHIC PACKAGING INTERNATIONAL, INC.'S
RESPONSIVE CLAIM CONSTRUCTION BRIEF**

T. Earl LeVere (0063515)
SCHOTTENSTEIN ZOX & DUNN CO., LPA
250 West Street
Columbus, Ohio 43215
Telephone: 614-462-1095
Facsimile:   614-228-4847
E-mail: elevere@szd.com

*Trial Attorney for Defendant and Counterclaimant
Graphic Packaging International, Inc.*

OF COUNSEL:

William M. Ragland, Jr.
WOMBLE CARLYLE SANDRIDGE & RICE LLP
271 17th Street, NW
Suite 2400
Atlanta, GA 30363-1017
Telephone: 404-888-7466
Facsimile:   404-870-2401
Email:  wragland@wcsr.com

Defendant and Counterclaimant Graphic Packaging International, Inc. ("Graphic Packaging") hereby responds to Multi-Color Corporation's ("Multi-Color") Opening Claim Construction Brief (Doc. # 34) ("Multi-Color Op. Br."), pursuant to S.D. Ohio Pat. R. 105.4(b) and this Court's Order issued May 6, 2011 (Doc. # 26).

I.      **INTRODUCTION**

Multi-Color's Opening Brief is fraught with errors and internal inconsistencies. From the outset, Multi-Color mischaracterizes its claimed invention, boasting that the inventor of U.S. Patent No. 7,622,171 ("the '171 Patent") solved a "long-felt disadvantage associated with the use of prior heat transfer labels," even though the supposed disadvantage has been solved for nearly thirty years. Multi-Color relies on the specification of the '171 Patent when it suits Multi-Color's position, but disregards the specification when it does not. Multi-Color also makes several mistakes in describing the law of claim construction, including overemphasizing the importance of expert testimony, and disregarding the legal tenet that claim language stating function and intended use does not operate as a claim limitation for purposes of *Markman* proceedings. Multi-Color also relies on the extrinsic testimony of Alan Levine, who has no experience in the field of heat transfer labels, printing, or coating, and no stated experience in wax chemistry. Even if considered, Mr. Levine's testimony is at odds with the specification of the '171 Patent and thus should not be credited. Finally, Multi-Color's proposed constructions are themselves inconsistent with the specification of the '171 Patent and mistakenly place reliance on one preferred embodiment to the exclusion of another.

Graphic Packaging's proposed constructions, on the other hand, are firmly grounded in the disclosure provided by the inventor, *i.e.*, the specification of the '171 Patent. Graphic Packaging's positions are also supplemented by the testimony of two persons of ordinary skill in the art, who both have been immersed in the heat transfer label field for many years.

Accordingly, Graphic Packaging respectfully requests that the Court reject Multi-Color's proposed claim constructions and adopt those proposed by Graphic Packaging.

## II. SUMMARY OF THE TECHNOLOGY

### A. The Claimed Novel Feature Of The '171 Patent Is The Use Of Microcrystalline Wax, Not The Elimination Of The Need For Surface Pre-Treatment As Multi-Color's Opening Brief Suggests.

Multi-Color implies that the named inventor of the '171 Patent was the first to discover a heat transfer label formulation that adheres to an article that had not been pre-treated by flaming. *See* Multi-Color Op. Br. at pp. 2-3 (claiming that the adhesive of the label claimed in the '171 Patent solves a "long-felt disadvantage" by eliminating the need for surface pre-treatment of the article being labeled). However, formulations that do not require flame pre-treating have existed for nearly thirty years. As early as 1983, U.S. patent applications described heat transfer labels having an "improved adhesive coating [that] obviates a long standing prior art need" to pre-treat articles by flaming prior to applying the heat transfer label. *See, e.g.*, U.S. Pat. No. 4,548,857 (issued Oct. 22, 1985) (Doc. # 35-4), Abstract. Numerous subsequent formulations purport to achieve the same objective. *See, e.g.*, U.S. Pat. No. 5,908,694 (issued Jun. 1, 1999); U.S. Pat. No. 6,344,269 (issued Feb. 5, 2002); U.S. Pat. No. 7,588,812 (issued Sep. 15, 2009).[1] At best, the '171 Patent merely discloses one such formulation. Its specification and prosecution history make clear that the only allegedly novel feature of the '171 Patent is the use of microcrystalline wax in the adhesive layer. '171 Pat., col. 2, ll. 46-55; col. 7, ll. 1-2; *see also* Response to Office Action, December 3, 2008, pp. 9-13 (Doc. # 35-2) (distinguishing the claimed invention from the prior art based on the elements of the adhesive layer).[2]

---

[1] The above-referenced patents are attached collectively hereto as Exhibit A.

[2] The use of microcrystalline wax, however, is <u>not</u> novel and is taught by a number of prior art references, as detailed in Graphic Packaging's Invalidity Contentions, served on May 5, 2011.

**B.** **Multi-Color's Proposed Level Of Ordinary Skill In The Art Is Unsuitable For The Relevant Technologies, And Is Vague And Ambiguous.**

The Court of Appeals for the Federal Circuit has established a list of non-exclusive factors to consider in determining the level of ordinary skill in the art, including: (1) the educational level of the inventor; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) the educational level of active workers in the field." *Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2009) (citations omitted).

Multi-Color proposes that the level of ordinary skill in the art is "medium," which is undefined and unhelpful, and that an "ordinary artisan would hold a Masters degree, or the experiential equivalent thereof, in analytical chemistry." *See* Multi-Color Op. Br. at p. 19. The language, "the experiential equivalent thereof," is vague and indefinite, and provides no guidance as to how such an equivalence would be gauged. Multi-Color's proposed level of ordinary skill in the art bears little relation to the fields of the claimed invention: adhesives, coatings, inks, printing, labels, or other similar technologies. Instead, Multi-Color's proposed level of ordinary skill appears geared toward Multi-Color's retained chemical testing expert, who apparently possesses no skills or experience relevant to developing heat transfer label, printing or coating products. While chemistry is indeed relevant to the fields associated with the claimed invention, at best "analytical" chemistry is much too narrow a field of study or experience to define the level of ordinary skill, and is certainly not a basic requirement for those working in the art. "Analytical" chemistry pertains to separating, identifying, and quantifying the chemical components of materials, and not to product development. *See* MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS 93 (6th ed. 2003) (attached as Exhibit B). In large part, those with experience in the heat transfer label field would not possess advanced degrees or even significant experience in analytical chemistry. Indeed, upon information and belief, the named

inventor of the '171 Patent, Jean Paul Laprade, does not possess any degree in analytical chemistry, much less a Masters Degree. Likewise, Alan Levine, Multi-Color's proposed expert, does not hold a degree in analytical chemistry. Curiously, Multi-Color has apparently tailored its proposed level of skill in the art to a potential expert witness who would merely be testing for the presence or absence of microcrystalline wax. The skills required for someone working for a testing lab (such as Alan Levine) do not necessarily match the skills and experience of a person who develops adhesives, coatings, inks, printing, labels, or other similar technologies relevant to the claimed invention.

By contrast, Graphic Packaging proposes an appropriate level of ordinary skill in the art that is grounded in the field of the invention and is consistent with the educational levels of the inventor and other active workers in the field. Declarants Saifuddin Ansari and Jeffrey Sloat, both employees of Graphic Packaging, have years of experience in the relevant fields and are the target audience for a patent directed to the fields of adhesives, coatings, inks, printing, labels, or other similar technologies. Indeed, Mr. Ansari is a named inventor of several U.S. patents relating to heat transfer label technology. *See* Ansari Decl., ¶ 4 (Doc. # 35-3). Graphic Packaging's proposed skill level is more consistent with these declarants' level of skill and experience. Graphic Packaging respectfully requests the Court to adopt its proposal that "a person of ordinary skill in the art is a person with (a) a Bachelor's Degree in Chemistry, Chemical Engineering, Materials Science, or other field of study that includes a similar scope of coursework or (b) three or more years of technical experience working with adhesives, coatings, inks, printing, labels, or other similar technologies."

III.    **THE LAW OF CLAIM CONSTRUCTION**

A.    **The Patent Claims, Specification, and Prosecution History Are Superior To Expert Testimony And Other Extrinsic Evidence In Determining The Meaning Of Claim Terms.**

Graphic Packaging and Multi-Color agree that the intrinsic evidence – the patent claims, specification, and prosecution history – are superior to extrinsic evidence in determining the proper construction of disputed claim terms.  Graphic Packaging Op. Br. at pp. 3-4; Multi-Color Op. Br. at pp. 5-8; *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1317-19 (Fed. Cir. 2005) (*en banc*) ("We have viewed extrinsic evidence in general as less reliable than the patent and its prosecution history in determining how to read claim terms…").  Graphic Packaging and Multi-Color also agree that a patentee can act as his own lexicographer and define a claim term either implicitly or explicitly in the specification or prosecution history, even in a manner that is contrary to the term's plain and ordinary meaning.  Graphic Packaging Op. Br. at pp. 3-4; Multi-Color Op. Br. at pp. 5-8; *see Rambus Inc. v. Infineon Technologies AG*, 318 F.3d 1081, 1088 (Fed. Cir. 2003).  In the case where the plain and ordinary meaning of a claim term is readily apparent even to lay persons and judges, the Court may simply apply the widely accepted meaning of the commonly understood word.  *See Phillips*, 415 F.3d at 1322.

Multi-Color, however, overemphasizes the importance of expert testimony (one form of extrinsic evidence) in its Opening Brief.  The Court must reject expert testimony if it is at odds with the intrinsic evidence.  *Phillips*, 415 F.3d at 1318.  Multi-Color relies on *AFG Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239 (Fed. Cir. 2001) to support an incorrect proposition that expert testimony is "indispensible" and that it may be reversible error for the Court to disregard such testimony.  *See* Multi-Color Op. Br. at p. 8.  The excerpt quoted by Multi-Color is narrowly limited to a set of facts where the offered expert testimony was "essentially undisputed" and was consistent with the specification.  *AFG Indus.*, 239 F.3d at 1249 ("O'Shaughnessy's essentially

undisputed testimony . . . reinforces the distinction drawn in the written description of the '532 patent between these two terms."). In contrast, the expert testimony offered by Multi-Color is not undisputed and is at odds with the plain language of the specification of the '171 Patent. *See infra*, Section IV.F.

Multi-Color also misstates the law regarding the role of claim language: "The Federal Circuit has repeatedly made it clear that all claim terms, including 'an article that has not undergone oxidizing treatment,' do in fact limit the scope of the inventions claimed in the '171 patent. *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004)...." *See* Multi-Color Op. Br. at p. 12. Obviously, the *Innova/Pure Water* case does not address whether the specific phrase, "an article that has not undergone oxidizing treatment," limits the scope of the claims in the '171 patent. The '717 Patent was not at issue there. More importantly, however, *Innova/Pure Water* does not support the broader statement that "all claim terms … do in fact limit the scope" of the claims. Multi-Color's own citations and parentheticals evidence the lack of such a hard-and-fast rule. *See id.* at 12 (citing *Innova/Pure Water, Inc.*, 381 F.3d at 1119, and stating, "While not an absolute rule, all claim terms are presumed to have meaning in a claim."). In fact, the Federal Circuit has clearly found exceptions to the presumption, such as statements of function or intended use that are merely the result of the claimed structure. *See, e.g., Marrin v. Griffin*, 599 F.3d 1290, 1294 (Fed. Cir. 2010); *Texas Instruments, Inc. v. Int'l Trade Comm'n*, 988 F.2d 1165, 1171-72 (Fed. Cir. 1993).

## IV.  CLAIM CONSTRUCTION ARGUMENT

### A.  "heat transfer label" – The Scope Of The Claims Is Fully Set Forth In The Body Of The Claims.

As explained in Graphic Packaging's Opening Brief, the preamble language "heat transfer label," adds no structure to the claims, but is merely a description of the structure defined in the body of the claims. Accordingly, because it does not limit the claims of the '171

Patent, it is unnecessary to construe the term "heat transfer label." *See, e.g., Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002).

If the Court nonetheless decides to construe "heat transfer label," Graphic Packaging's proposed construction, "a multi-layered structure," is appropriate, while Multi-Color's proposed construction is unnecessarily restrictive and inaccurate. In its Opening Brief, Multi-Color contends that "multi-layered structure" is not correct because a "sandwich is a 'multi-layered' structure,' but it would be absurd to suggest that such a 'multi-layered structure' is a 'label.'" Multi-Color Op. Br. at p. 9. Multi-Color's attempted analogy is flawed. The preamble term "heat transfer label" does not define the scope of the claim. While a sandwich may be a "multi-layered structure," only a "multi-layered structure" with all of the elements set forth in the body of the claim – *e.g.*, a support portion, and a transfer portion including an ink layer and an adhesive layer comprising a vinyl acetate resin, a tackifying petroleum hydrocarbon resin, and a microcrystalline wax – would be covered by the claim.

Multi-Color also contends that labels must "decorat[e]" or "'giv[e] information about' the article to which they are adhered." That statement is incorrect because, as explained in Graphic Packaging's Opening Brief, a label could provide information about the contents of the article rather than the article itself, or the label could provide other information completely unrelated to the article or, where applicable, its contents. *See* Graphic Packaging Op. Br. at pp. 6-7; *see also* Ansari Decl. at ¶ 14 (Doc. # 35-3).

Supposedly in support of its proposed definition of "heat transfer label," Multi-Color cites to two excerpts from the specification. Multi-Color Op. Br. at p. 9. The first excerpt relates to the word "laminate." However, this term is not helpful because it has multiple meanings, the most accurate of which is "layered structure." *See* Graphic Packaging Op. Br. at p. 6, fn 4.

Thus, adopting Graphic Packaging's "multi-layered structure" would be accurate and, unlike Multi-Color's "multi-layered laminate," would not require further construction.

Multi-Color's second cited excerpt relates to the process by which a heat transfer label <u>is</u> <u>applied</u> to an article. '171 Pat., col. 1, ll. 27-30. The claimed invention, however, is the structure alone. Neither the process of applying the heat transfer label to an article nor the article itself is part of the invention.[3] *See* Graphic Packaging Op. Br. at p. 7. Even if it were proper to include language in the definition that describes the application process rather than just the claimed structure, Multi-Color's proposed construction fails to mention a relevant part of the specification indicating that pressure is required for proper transfer of a heat transfer label to an article. '171 Patent, col. 1, ll. 36-39 ("the label <u>is pressed</u> onto an article with the ink design layer making direct contact with the article" (emphasis added)). Multi-Color's proposed definition omits any reference to the requirement of pressure in addition to heat for application of a label to an object.

**B.** **"support portion" –** <u>**Multi-Color's Proposed Construction Excludes A**</u> <u>**Preferred Embodiment Of The Claimed Invention.**</u>

Multi-Color's argument in support of its proposed definition of "support portion," particularly its inclusion of the term "release portion" in the definition, is hard to decipher. On the one hand, Multi-Color seems to argue that "release portion" refers to a combination of parts, including a release layer and skim coat. *See* Multi-Color Op. Br. at p. 10 ("the release portion may itself include a release layer" and "release portion 16 may include (1) a nonwax release layer 20, and (2) a skim coat"). On the other hand, Multi-Color also argues that "release portion" is *itself* part of the release layer or skim coat. *See id.* ("only a portion of the release [sic] may transfer"). As explained below, both arguments are wrong.

---

[3] The inventor did not include claims to the method of application of a heat transfer label, nor did he employ functional language within the context of 35 U.S.C. § 112, paragraph 6.

The specification of the '171 Patent discloses two preferred embodiments, both of which describe the "support portion" as having a "release layer."  *See* '171 Patent, col. 3, ll. 31-47; col. 4, ll. 1-30; Graphic Packaging Op. Br. at p. 8.  By contrast, only one of the preferred embodiments describes a support portion having a "release portion."  Below are annotated figures from the '171 Patent representing the two preferred embodiments.



As is apparent from the drawings, the support portion of <u>both</u> preferred embodiments contains a release layer.  In arguing that "release portion" rather than "release layer" should be used in the definition of "support portion," Multi-Color improperly focuses only on the one embodiment that refers in some way to a "release portion," ignoring the other preferred embodiment (FIG. 2), which does not have a "release portion" containing a skim coat.  Multi-Color's proposed construction excludes the second preferred embodiment, which neither describes nor implies the existence of a "release portion."  It is well-settled that "a construction that excludes a preferred embodiment is 'rarely, if ever, correct.'"  *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 865 (Fed. Cir. 2004) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir.

1996).  Thus, Multi-Color's argument that the "support portion" includes a "release portion" having both a release layer and a skim coat cannot be correct.[4]

Multi-Color also seems to contend that, as used in its proposed construction of "support portion," "release portion" refers only to the part of the release layer (and skim coat, if applicable) that does not transfer to the article along with the transfer portion.  *See* Multi-Color Op. Br. at p. 10.  Such a use of "release portion" would be directly contrary to how that term is used in the specification.  As shown in the Figure 1 above, the entire "release portion" in the one preferred embodiment, which includes a release layer and skim coat, is part of the support portion.  The term "release portion" is not used anywhere else in the specification of the '171 Patent.  Further, it is improper to define the structure of the heat transfer label at any time during or after application to an article  The structure depicted in the figures of the '171 Patent and described in the specification is that of the heat transfer label *before* application to an article.  To define the heat transfer label at any other time would render certain claimed elements meaningless, including the "support portion," which is discarded after the heat transfer label has been applied to an article.

Finally, Multi-Color may contend that claim 17 of the '171 Patent is somehow inconsistent with Graphic Packaging's proposed construction of "support portion."  Such a contention would be incorrect.  Claim 17 is a dependent claim that depends on independent claim 1.  Claim 17 recites a heat transfer label further comprising "a release layer interposed between said support portion and said transfer portion, the release layer chosen from a wax release layer … or a non-wax release layer including a wax skim coat …."  '171 Patent, col. 10, ll. 50-56.  In light of the awkward phrasing of claim 17, Multi-Color may argue that this excerpt implies that

---

[4]  Multi-Color's reliance on only one of two preferred embodiments is particularly inappropriate because Multi-Color does not allege that the accused products contain the "skim coat" included in this embodiment.

the "release layer" is separate and apart from the "support portion." Such an argument would fly in the face of the explicit teaching of the '171 Patent.[5] As shown in Figures 1 and 2 above and as repeatedly described in the specification, the release layer is clearly part of the support portion. *See, e.g.*, '171 Patent, col. 1, ll. 24-27; col. 3, ll. 31-47; col. 4, ll. 48-49. In reality, rather than undercut Graphic Packaging's proposed construction, the language of claim 17 actually supports Graphic Packaging's construction because it recites a "release <u>layer</u>," not a "release portion."

### C. "transfer portion" – <u>Graphic Packaging's Construction Is The Only Construction Consistent With The Specification.</u>

The specification of the '171 Patent repeatedly defines the "transfer portion" as comprising a protective lacquer layer, an ink design layer, and an adhesive layer. *See, e.g.,* '171 Patent, col. 3, ll. 48-53. Both figures of the '171 Patent – which represent the only two disclosed embodiments – depict all three of those layers, including the protective lacquer layer. '171 Pat., FIGS. 1 and 2. Inclusion of all three layers is also consistent with how one of ordinary skill in the art would describe the composition of the "transfer portion." *See also* Ansari Decl. at ¶ 8 (Doc. # 35-3). Graphic Packaging's proposed construction, then, is consistent with the specification and drawings of the '171 Patent.

Multi-Color asserts that the term "transfer portion" should not be construed to exclude the entire release portion because "the '171 patent expressly contemplates some of the release portion transferring." *See* Multi-Color Op. Br. at p. 12. This assertion is incorrect because the claims cover only the structure of the heat transfer label before application to an article. It cannot be disputed that the claims do not cover the method of applying the heat transfer labels to articles. As explained above in Section IV.B, what happens to the claimed structure during or

---

[5]   Multi-Color's argument would also contradict its own proposed construction. Multi-Color contends that "support portion" includes a "release portion," which Multi-Color claims contains a "release layer." Multi-Color Op. Br. at p. 10. Multi-Color cannot properly argue that the "release layer" is a part of the "release portion" (and thus a part of the "support portion") but also separate and apart from the "support portion."

after application of the heat transfer label to an article is irrelevant to construction of a claim term. Multi-Color would have the "release portion" be a part of both the "support portion" and the "transfer portion," which is contrary to the express teaching of the specification.

**D.** **"for transfer of the transfer portion from the support portion to an article that has not undergone an oxidizing treatment upon application of heat to the support portion while the transfer portion is placed into contact with the article"**

In its Opening Brief, Multi-Color ignores this phrase entirely and presents argument directed only to an excerpt of this phrase, as discussed below in Section IV.E.

**E.** **"an article that has not undergone an oxidizing treatment" – <u>Like The Longer Phrase Of Which It Is A Part, This Statement Of Function And Intended Use Does Not Limit The Scope Of The Claim</u>**

Multi-Color opens its argument regarding this disputed phrase with the untruth that "all claim terms … do in fact limit the scope of the invention[]." The cited cases and parentheticals that follow Multi-Color's statement contradict that proposition, and instead merely support the general principle that actual claim terms should be given effect. However, this general principle is not an absolute rule. *See, e.g., Innova/Pure Water, Inc.*, 381 F.3d at 1119. This disputed phrase is an excerpt of the longer disputed phrase of Section IV.D, which is a statement of function and intended use that does not limit the scope of the claims and thus does not require construction. *See, e.g., Marrin v. Griffin*, 599 F.3d 1290, 1294 (Fed. Cir. 2010); *Texas Instruments, Inc. v. Int'l Trade Comm'n*, 988 F.2d 1165, 1171-72 (Fed. Cir. 1993); Graphic Packaging Op. Br. at pp. 4-5, 10-11. Multi-Color only gives passing treatment to the issue of claim language that states function or intended use. Multi-Color Op. Br. at p. 14. Multi-Color contends that this disputed phrase "does not employ functional language," and that even if it did the phrase would still limit the scope of the invention. *Id.* Multi-Color is incorrect.

Multi-Color cites an excerpt from the specification of the '171 Patent – "the adhesive of the present invention *can bond* to nonoxidized polyethylene, polypropylene PET, and

acrylonitrile surfaces…" – in an attempt to support its argument that the disputed phrase limits the claims.  Multi-Color Op. Br. at p. 13 (emphasis added).  As support, Multi-Color points to *Verizon Services Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007).  Multi-Color's reliance on *Verizon* is misplaced.  The claims at issue in *Verizon* were *method* claims that called for the transmission of data to and from a "localized wireless gateway system," which was required to actively compress and decompress signals, and to send and receive the compressed signals.  *See Verizon*, 503 F.3d at 1300.  As explained above in Section IV.A, the '171 Patent does not include method claims.  Instead, Multi-Color claimed the *structure* of a heat transfer label.  The excerpt of the specification cited by Multi-Color suggests that the claimed structure allows the heat transfer label to be capable of bonding to nonoxidized articles.  However, that capability – *i.e.*, intended use – is merely the *result of the claimed structure* of the heat transfer label.  Thus, the phrase describing such capability does not limit the scope of the claims and may be ignored.  *See, e.g., Texas Instruments*, 988 F.2d at 1171-72.  Therefore, no construction by the Court is needed.[6]

Even if the phrase were construed, the plain and ordinary meaning is readily apparent.  *See* Graphic Packaging Op. Br. at p. 12.  Multi-Color speaks ill of importing limitations into a claim from the specification, but attempts to do so here.  One of ordinary skill in the art would understand that an "article" is broad enough to encompass a variety of different objects, including flat objects, round objects, and irregularly shaped objects.  *See* Ansari Decl., ¶ 12.  The Court should reject Multi-Color's proposal to narrow the phrase by redefining and limiting the widely understood term "article" to only mean "container."  *Phillips*, 415 F.3d at 1322 (the court

---

[6]  Multi-Color also urges construction of the phrase because it relates to "the problem being worked on and the very nature of the solution to that problem," but as explained in Section II.A above, this particular "problem" was solved nearly thirty years ago.  The '171 Patent simply discloses a particular formulation of a heat transfer label that supposedly has the capability to perform the same function, *i.e.*, adhere to a nonoxidized article.

may apply the widely accepted meaning of a commonly understood term without searching the specification and other evidence for guidance).  Incredibly, Multi-Color proposes narrowing the phrase even further to restrict the term "article" to mean only containers made of certain materials and that "typically would be, but [have] not been" oxidized.  Multi-Color again appeals to the problem being worked on by the inventor of the '171 patent, which as explained above has long since been solved.  There is no legitimate basis to depart from the plain and ordinary meaning of the claim term "article," which is a widely understood term and can be readily understood by one of ordinary skill in the art.  Multi-Color cannot credibly contend that any special, narrow definition of the term "article" or any other part of the disputed phrase should apply, as neither the claims nor the specification would support such a contention.

F.     **"microcrystalline wax" – Multi-Color's Proposed Construction Is Incomplete and Paraphrases Only Portions Of The Specification; Multi-Color's Declaration Is At Odds With The Plain Language Of The Specification.**

Multi-Color contends that its proposed construction of the term "microcrystalline wax" is "derived directly from the specification of the '171 patent" and that "each component of Multi-Color's proposed definition is a direct excerpt from the specification."  Multi-Color Op. Br. at p. 15.  These statements are plainly wrong.  In reality, Multi-Color pieced together and paraphrased only selected words and phrases from the specification, but omitted from its proposed construction other important definitional language from the specification.  Multi-Color acknowledges and cites the following excerpt from the specification: "'[m]icrocrystalline waxes (microwaxes) are characterized by an *increased amount of branching*.' (Col. 6, ll. 37-39)." Multi-Color Op. Br. at p. 15 (emphasis added).  Yet Multi-Color inexplicably omits from its proposed construction the crucial detail regarding the proportion (*i.e.*, increased amount) of branching.  *See, e.g.*, Graphic Packaging Op. Br. at pp. 15-16; Sloat Decl., ¶ 13 (Doc. # 35-9).  In fact, documents produced by Multi-Color during discovery emphasize that the increased portion

of branched and cyclic molecules are a distinguishing characteristic of microcrystalline wax. *See, e.g.,* MUCC067045-46 (Exhibit C hereto).  In its proposed construction, Multi-Color also omits any mention of the hydrocarbon chain length and molecular weight of microcrystalline wax as described in the specification, which are details that one of ordinary skill in the art would find important.  *See* Sloat Decl., ¶ 12.  Multi-Color's own documents state that molecular weight is a distinguishing characteristic of microcrystalline wax.  *See, e.g.*, Exh. C, MUCC067045-46.

Instead, Multi-Color relies on the declaration of Alan M. Levine to support its proposed construction, but Mr. Levine's testimony is flawed and should be rejected.[7]  First, Mr. Levine observes that "the number of carbon (sic) chains is not the defining determinant whether a wax is microcrystalline or not."  *See* Declaration of Alan M. Levine ("Levine Decl.") at ¶ 5 (Doc. # 34-4).  Graphic Packaging has not contended that hydrocarbon chain length is *the only* defining characteristic of microcrystalline wax, but rather is one of numerous characteristics that is useful in distinguishing between various waxes.  *See* Graphic Packaging Op. Br. at pp. 14-15; *see also* Sloat Decl., ¶ 12.  For the very reason that there is no single defining characteristic, one of ordinary skill in the art would need all of the detail the specification provides as a definition.  *See* Sloat Decl., ¶¶ 9-11.  The patentee considered the hydrocarbon chain length and molecular weight to be significant enough to include those features in his definition of "microcrystalline wax" set forth in the specification.  One of ordinary skill in the art would include those characteristics in the construction of "microcrystalline wax."  *See* Sloat Decl., ¶ 12.

Mr. Levine states that "a wax with a carbon number $C_{30}$ could be a microcrystalline wax, if the wax is characterized by the description disclosed in the specification of the '171 Patent." *See* Levine Decl., ¶ 6.  First, this statement is in direct conflict with the definition of microcrystalline wax provided in the specification, which expressly provides a range of

---

[7]  *See* Graphic Packaging's objections to Multi-Color's extrinsic evidence in Section V below.

acceptable carbon numbers <u>starting</u> at $C_{34}$.[8]  Expert testimony that contradicts the specification should be disregarded.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (*en banc*).  The patentee chose to be his own lexicographer in providing the defined ranges of hydrocarbon chain lengths and molecular weights for this invention (*see* Sloat Decl., ¶ 12), therefore the claim term must be construed as defined by the inventor in the specification.  S*ee In re Glaug*, 283 F.3d 1335, 1340 (Fed. Cir. 2002).  Second, Mr. Levine does not dispute the fact that hydrocarbon chain length and molecular weight can distinguish microcrystalline wax from other types of waxes besides paraffin wax.  That fact alone warrants inclusion of such distinguishing details.  *See* Sloat Decl., ¶ 11.

Multi-Color also suggests that the definition given by the inventor for the term "microcrystalline wax" is merely an example.  Incredibly, Multi-Color contends that the specification's use of "characteristically contains" and "characterized by" does not mean that the features following these terms are necessarily included in "microcrystalline wax."  *See* Multi-Color Op. Br. at p. 16; Levine Decl., ¶ 7.  First, Multi-Color ignores the fact that "characterized" means "to be a distinguishing trait or mark of."  *See* AMERICAN HERITAGE DICTIONARY 226 (Houghton Mifflin Company 1978) ( attached as Exhibit E). [9]  Second, a claim that the inventor's description is merely an example undermines Multi-Color's own proposed construction.  Multi-Color itself touts its own adherence to the specification and states that "the specification describes *what a microcrystalline wax is*."  Multi-Color Op. Br. at p.15 (emphasis added).

---

[8]  Further, Mr. Levine's statement that "a particular number of carbon chains such as $C_{30}$, $C_{35}$, or $C_{40}$, indicates that microcrystalline wax is likely present" is inaccurate.  For example, there are a myriad of materials, including non-waxes, that have carbon chains of those lengths.  *See* THE MERCK INDEX, Formula Index (FI-67 – FI-71) (13th ed. 2009) (attached as Exhibit D).  It is the unique *hydrocarbon* chain lengths that are distinctive.

[9]  Indeed, the Manual of Patent Examining Procedure acknowledges that "characterized by" is a synonym for "comprising" (*see* M.P.E.P. 2111.03), a term of art used in claim language which means that the named elements are essential, though not exclusive of other elements.  *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997).

G.     **"release agent" – <u>The Specification Supports Graphic Packaging's Proposed Construction.</u>**

Multi-Color states that the "release agent need not necessarily be located in the protective lacquer layer." Multi-Color Op. Br. at p. 17. This is incorrect. The release agent, if present, must be located in the protective lacquer layer. A plain reading of the claims and specification of the '171 Patent supports such a construction. The specification describes the release agent as being present *only* when the protective lacquer layer is present. *See* '171 Patent, col. 5, ll. 7-8 ("The protective lacquer layer 24 may include a release agent…"). Nowhere in the '171 Patent is a release agent included in any other part or layer of the heat transfer label. Claims 8 and 10, pointed to by Multi-Color in its Opening Brief, support Graphic Packaging's proposed construction. Tellingly, Claim 10, which introduces the term "release agent," depends on Claim 8, which includes the protective lacquer layer. *See* '171 Patent, col. 10, ll. 28-30. Thus, it is clear that the "release agent" must be located in the protective lacquer layer, and one of ordinary skill in the art would need that level of detail regarding the location of the release agent to understand the goal of facilitating separation of the transfer portion from the support portion. *See* Ansari Decl., ¶ 22.

H.     **"hard polyester resin" – <u>The Term "Hard" Requires A Quantifiable Value Or Defined Range, Not An Unhelpful And Indefinite Substitute.</u>**

How hard is "hard"? Multi-Color's proposed construction of "hard polyester resin" is not helpful in answering this question. Multi-Color's proposed substitute for the word "hard" is "resistant to surface indentation," which itself is indefinite and raises the question of how "resistant to surface indentation" a resin must be to satisfy the claim. In contrast, both the claims and specification of the '171 Patent offer guidance regarding the degree of hardness required to qualify as a "hard polyester resin" for purposes of the claimed invention (*see* '171 Patent, col. 5,

ll. 8-13; col. 10, ll. 22-27), and should control the meaning of the term.  *See, e.g., Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1352 (Fed. Cir. 2010); *Phillips*, 415 F.3d at 1317.

Multi-Color asserts that the specification provides a second example of a "hard polyester resin."  However, as noted in Graphic Packaging's Opening Brief (at p. 19, fn. 8), that resin is not referred to as a "hard polyester resin."  *See* '171 Patent, col. 5, ll. 30-33.  Multi-Color improperly disregards the specification's description of "hard polyester resin" and relies solely on vague extrinsic evidence.  Graphic Packaging, on the other hand, relies on the specification and claims, which explicitly provide defined, objective values for "hard polyester resin."

## V.  GRAPHIC PACKAGING OBJECTS TO MULTI-COLOR'S DECLARATION OF ALAN M. LEVINE.

Additionally, pursuant to S.D. Ohio Pat. R. 105.4(b), Graphic Packaging objects to the Declaration of Alan M. Levine, which Multi-Color offers as extrinsic evidence in support of its proposed claim constructions.  Rule 702 of the Federal Rules of Evidence allows a qualified witness to testify in the form of an opinion if the witness' "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue" and if the testimony is based on sufficient facts or data and the testimony is the product of reliable principles and methods which have been reasonably applied to the facts of the case.  Fed. R. Evid. 702.  Rule 702 was modified in 2000 to reflect the Supreme Court's mandates in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), that the trial court serve as a gatekeeper and conduct a preliminary assessment of relevance and reliability whenever a witness testifies to an opinion based on specialized knowledge.

Based upon the foregoing , the Court should exclude Mr. Levine's declaration.  From his testimony and attached *curriculum vitae*, it appears that Mr. Levine's background is in a testing laboratory, and not in the specific field of invention at issue here.  Accordingly, Mr. Levine

cannot speak as to how one of ordinary skill in the art relevant to the claimed invention would read the '171 Patent.[10] Mr. Levine has no experience developing products in the heat transfer label field, or in other similar fields such as adhesives, coatings, inks, printing, or labels generally. He does not possess a Bachelor's degree (much less a Master's degree) in Chemistry, Chemical Engineering, or Materials Science, and therefore would not meet would not meet the criteria proposed by Graphic Packaging for one of ordinary skill in the art. Mr. Levine would not even qualify as a person of ordinary skill in the art under Multi-Color's proposed definition for the level of ordinary skill. He does not possess any degree in analytical chemistry, and the additional language defining a person of ordinary skill in the art proposed by Multi-Color – "the experiential equivalent thereof" – is vague and ambiguous.[11] Furthermore, because Mr. Levine does not have substantial experience in the relevant fields, he is likewise unqualified to opine on the relevant level of ordinary skill in the art.

Additionally, Mr. Levine's opinions are substantively flawed. He states that "a wax with a carbon number $C_{30}$ could be a microcrystalline wax, if the wax is characterized by the description disclosed in the specification of the '171 Patent." *See* Levine Decl., ¶ 6. This statement is clearly incorrect because a wax with a carbon number $C_{30}$ would not be characterized by the description disclosed in the specification of the '171 Patent, which explicitly provides a range of acceptable carbon numbers starting at $C_{34}$. Courts should disregard expert testimony that contradicts the specification. *See Phillips*, 415 F.3d at 1318. Thus, the Court should exclude the Declaration of Alan M. Levine.

---

[10] Without conceding that Mr. Levine would qualify as such, an analytical chemistry testing expert would be better suited for later stages of this case, for example, for providing opinions on tests related to infringement.

[11] It is also noteworthy that Mr. Levine does not appear to have any experience with wax chemistry, despite the fact that he renders an opinion regarding the meaning of the term "microcrystalline wax."

## VI.   **CONCLUSION**

For the foregoing reasons, Graphic Packaging respectfully requests the Court to adopt its proposed constructions of the disputed claim terms.

Dated:  December 5, 2011                            Respectfully submitted,

                                                                s/ T. Earl LeVere
                                                                T. Earl LeVere (0063515)
                                                                SCHOTTENSTEIN ZOX & DUNN CO., LPA
                                                                250 West Street
                                                                Columbus, Ohio 43215
                                                                Telephone:  614-462-1095
                                                                Facsimile:    614-228-4847
                                                                E-mail: elevere@szd.com

                                                                *Trial Attorney for Defendant and Counterclaimant
                                                                Graphic Packaging International, Inc.*

OF COUNSEL:
William M. Ragland, Jr.
WOMBLE CARLYLE SANDRIDGE & RICE LLP
271 17th Street, NW, Suite 2400
Atlanta, GA 30363-1017
Telephone:  404-888-7466
Facsimile:    404-870-2401
Email:  wragland@wcsr.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 5, 2011, the foregoing **Graphic Packaging International, Inc.'s Responsive Claim Construction Brief** was filed electronically by Defendant with the Clerk of Court.  Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

                                                        s/ T. Earl LeVere
                                                        T. Earl LeVere